(Decided Dec. 11th, 1863.)

RICHARD COLVIN *vs.* ELISHA WARFORD, ET ALS., LESSEE.

WILLS: DECLARATIONS OF DECEASED ATTESTING WITNESS.—In an action of ejectment to recover possession of certain parcels of land claimed by the lessors of the plaintiff, as heirs at law of R. C., the defendant claimed under wills executed by R. C. on the 6th April 1848, and 30th October 1845, in both of which he was devisee of the property in question. The lessors of the plaintiff proved the execution and contents of a will of R. C., executed in 1847, revoking the will of 1845; and also proved that on the day of the execution of the will of 1848, one of the subscribing witnesses thereto, (since deceased,) stated to the witness that R. C. "had executed a will, and that she was not fit, and was crazy," and that he had only attested her signature, and added, that he had said the same to another of the attesting witnesses, who replied that she, (R. C.,) "was competent," but that "he had observed her incoherency." The declarations of the attesting witness being objected to, it was held:

Colvin *vs.* Warford, et als. Lessee.

1st. That the declarations of the attesting witness were admissible for the purpose of rebutting the *prima facie* effect of his attestation.

PRACTICE IN COURT OF APPEALS.—2nd. As to that portion of the evidence showing the conversation between the attesting witness and his fellow witness, the question is different, but conceding that it was inadmissible, the ruling of the Court below on the exception, as it stands, will not be reversed; for according to the settled practice of this Court, the appellant loses the advantage of his objection if any part of the evidence covered by the exception was admissible.

WILLS: TESTAMENTARY CAPACITY, TEST OF.—An instruction is not objectionable because the statement therein of what constitutes a sufficient testamentary capacity, in the terms of the Act of 1798, ch. 101, sub-ch. 1, sec. 8, is followed by an explanation of their legal meaning and effect, entirely consistent with the clause itself, and so clear and explicit that it could not have confused or mislead the jury.

——: ——: PRACTICE: PRAYERS.—The simple enunciation in a prayer that certain facts therein set forth, which the jury might otherwise have disregarded, constituted evidence on the question of testamentary capacity, is not error.

——: ——: EVIDENCE.—For the purpose of showing the condition of the mind of the testatrix when the wills in question were executed, any evidence of the circumstances and nature of its action, both before and after these periods, was admissible.

DECLARATIONS OF LUNATIC TESTATRIX DURING LUCID INTERVAL: EVIDENCE.— The declarations of a testatrix, at a time when her mind was in a condition of sanity, that she was crazy when she executed a particular will, if believed by the jury to have been made with a desire and design to speak the truth, are evidence from which the jury may infer, in connection with other facts, that she was not of sound and disposing mind and capable of making a valid deed or contract, at the time of the execution of that will.

WILLS,—REVOCATION OF.—Where the revocation of a previous will is implied from the inconsistent testamentary provisions of one subsequently executed, the revocation depends upon the testamentary purposes expressed in the last will, which, of necessity, continue to be ambulatory and revocable during the life of the testator.

But a clause in a subsequent will, which in terms revokes a previous will, is not only an expression of the purpose to revoke the previous will, but an actual consummation of it, and the revocation is complete and conclusive, without regard to the testamentary provisions of the will containing it.

A will, valid in its essential parts, but inoperative from other circumstances, may nevertheless have the effect of revoking a previous will.

In a case where the revocation of a will results by implication from the testamentary provisions of a subsequent will, the objection, that the contents of the subsequent will were not proved with sufficient certainty to have

Colvin *vs.* Warford, et als. Lessee.

effect as a devising will, may be fatal to its being set up as a revoking will, but where the subsequent will contains a clause *expressly revoking* the previous will, and is destroyed and rendered wholly inoperative as a devising will, whether the independent effect of the revoking clause, or the inoperative character of the will be considered, the objection stated cannot be maintained.

EVIDENCE: THE CANCELLATION OF A REVOKING WILL, *prima facie*, is evidence of intention to revive the previous will, but the presumption of that intention from the mere act of cancellation may be strengthened, qualified, or rebutted altogether, by evidence of the attending circumstances, and probable motives of the testator.

The destruction of the will of 1847, by the testatrix, if that fact were found, did not revive the will of 1845, unless it was further found that the testatrix so intended, and that the destruction of the will of 1847, if done by her when sane, was *prima facie* evidence of that intention.

SEALING, WHEN ESSENTIAL TO GIVE EFFECT TO DEED.—The whole of a certain lot, No. 13, was leased, with a covenant for perpetual renewals, in 1777, by one N. R. to J. W., and the part thereof in question, by a course of regular assignments, came into the ownership and possession of P. C. the father of R. C., the testatrix in this case, subject to one-half of the rent reserved on the whole; R. C. being entitled to and in possession of said property as the only child and legal representative of her father, afterwards, in 1823, purchased the reversion therein from L. N. R., the sole heir of N. R., then deceased, and ceased to pay the rent from that time; but the written paper purporting to be a deed and duly recorded as such, by which the conveyance of the reversion was made was not sealed by the grantor. HELD:

That the instrument intended to effect the transfer, was wholly inoperative for that purpose, and whatever effect it had in establishing an equitable claim to the property, it is clear that the legal title was still outstanding, and that the property cannot be regarded as real estate, within the purview of this case.

PRESUMPTION—OF TITLE FROM POSSESSION—AND, OF GRANT.—The presumption of title from possession, arises only when the possession proved, appears to have been perfectly consistent with an unqualified ownership. The correlative proposition, that a grant will not be presumed when the possession is explained by evidence, showing that it was taken in virtue of some qualified interest or estate less than that of an absolute title, is equally well founded.

APPEAL from the Superior Court of Baltimore City :

This case was heretofore before this Court, and is reported in 14 *Md. Rep.*, 532. It was then, as now, an action of ejectment, instituted in the Superior Court of Baltimore

City, by the appellees, as plaintiffs, alleging themselves to be eight of eleven heirs at law of Rachel Colvin, and claiming a large amount of real estate, in different parts of the City of Baltimore.

To defeat the claim of the appellees, the appellant gave in evidence two wills of the said Rachel, duly executed to pass real estate. One was a will dated the 6th of April, A. D. 1848, and which had been duly admitted to probate in the Orphans' Court of Baltimore City, after the trial of issues, sent from said Court to the Superior Court of Baltimore City, and thence removed to the Circuit Court for Baltimore County. The ruling of the Court on the trial of the said issues, and its judgment on the finding of the jury thereon, were affirmed by this Court in 7 *Md. Rep.*, 582; and in that case, page 583, the issues, which were all found in favor of the present appellant, are given. The other was a will dated on the 30th of October 1845.

By both of these wills her entire real estate was devised to the appellant, and other devisees competent to take; and none of the appellees, or other heirs at law of the said Rachel, are named in either of said wills of 1845 or 1848.

To overcome the effect of these wills, the appellees in the trial below in the present case, offered evidence to show that said wills were executed by said Rachel Colvin, when she was not of a sound and disposing mind, that the appellant improperly influenced her in their execution, and that even if the will of 1845, was a valid will at the period of its execution, it was revoked by a subsequent will made by said Rachel in the year 1847, but not in existence at the death of said testatrix; and which said will of 1847, the appellees relied on as valid and operative to revoke the will of 1845.

The appellant proved that neither in said will of 1847, nor in any of the wills of said testatrix, were the appellees, or any of them, named as devisees. Such portions of the mass of evidence adduced at the trial of the cause, as are essential to a proper understanding of the points

decided and stated in effect, and appear *infra* in the several prayers of the plaintiffs and defendant, the instructions given by the Court below, and the opinion of this Court.

In the examination-in-chief of Mr. Teackle, (one of the plaintiffs' witnesses,) in reference to the will of 1848, and before the defendant had examined any witness, the said witness proved that the Rev. Dr. Johns, and Dr. Andrews, were witnesses to said will, and that his brother, Dr. Teackle, who was also a witness to said will, was dead; and said witness then proceeded to prove certain declarations of his said brother, made to him, the witness, at his office, on the afternoon of the day upon which the will was executed, and also declarations made to Dr. Johns, another of said witnesses, to the effect that he, the said Dr. Teackle, although he witnessed the will, did not consider the testatrix fit to make it, and that in witnessing said will, he was only attesting her signature; to the proof of these declarations of Dr. Teackle, the defendant, (the appellant,) objected, but the Court overruled the objection, and permitted said declarations to be given in evidence to the jury, to which the defendant excepted, and this constitutes the appellants' *first exception.*

*Second exception.* The testimony being closed, the lessors of the plaintiff by their counsel submitted eleven prayers, of which the 1st, 2nd, 6th and 7th rejected by the Court, are here omitted. The prayers granted were as follows:

3d. That it is the province of the jury to decide upon the testamentary capacity of the said Rachel Colvin, at the respective times of the execution by her of the wills of 30th October 1845, and the 6th April 1848, if the jury shall find that she did execute them, and in doing so, it is competent for the jury to take into consideration the departure by the said Rachel in and by the provisions of the said wills from her testamentary purposes and intentions entertained, declared and long adhered to by her, at a period when her mind was undoubtedly sane, in connection with all the circumstances of the case, if the jury from the evi-

dence shall believe that such testamentary purposes and intentions were entertained, declared and long adhered to by her at a period when her mind was undoubtedly sane, and if the jury also find from the evidence such departure.

4th. That it is the province of the jury to decide upon the testamentary capacity of the said Rachel Colvin at the respective times of the executions by her of the wills of the 30th October 1845, and the 6th April 1848, if the jury shall find that she did execute them, and in doing so, it is competent for the jury to take into consideration the oscillations and fluctuations of the testamentary intentions of the said Rachel as manifested in the execution of many wills, and the preparation of many more, which she did not execute, differing materially and essentially in their provisions in connection with all the circumstances of the case, provided the jury shall find such oscillations and fluctuations, manifested as aforesaid, to be true in point of fact.

5th. That it is the province of the jury to decide upon the testamentary capacity of the said Rachel Colvin at the times mentioned in the two preceding prayers, and in doing so, it is competent for them to take into their consideration the fact of the said Rachel having been attacked by apoplexy and paralysis in 1842 and 1843, if the jury shall believe such facts, and also the fact of her having died a maniac in 1843, if they shall believe such fact, and to judge of the effect of such attack in 1842 and 1843, upon the testamentary capacity of the said Rachel in connection with all the circumstances of the case.

8th. That the verdict of the jury in this case cannot affect the validity of any deeds or contracts, alleged to have been made by the deceased at any time with other persons not parties to this cause.

9th. That in deciding upon the testamentary capacity of the said Rachel Colvin, the jury may take into consideration, in connection with all the circumstances of the case, any influence which the defendant may have exerted upon the mind of the deceased, in reference to her disposition of her property by will. Whatever they may find the degree

Colvin *vs.* Warford, et als. Lessee.

of that influence to have been, provided the jury find from the evidence that any such influence was exerted by the defendant.

10th. The plaintiffs pray the Court to instruct the jury, that if they believe from the evidence that Rachel Colvin, after the attack of hemorrhage in the early part of 1849, became, or was sane, and whilst in that condition, sent for her counsel, Mr. Teackle, who had drawn for her a will which had been executed by her on the 6th of April 1848, (if the jury so find the facts,) and that she drew it from under her pillow, and holding it up to him asked him how he came to let her execute it, and that he said to her that he had protested against it, and that she then said she was crazy when she executed that will, but was too weak then to give him instructions for another, and that Mr. Teackle could not get into the house to see her afterwards, though he called several times, until she relapsed into a state of insanity, or became insane, (according as the jury may find as to her then and previous condition,) and if the jury believe that Rachel Colvin, whilst thus conversing with Mr. Teackle, desired and designed to speak the truth, then this is evidence from which the jury may infer, in connection with the other facts in this case, that she was not of sound and disposing mind, and capable of making a valid deed or contract when she did so execute the will of the 6th of April 1848, given in evidence by defendant.

11th. The facts upon which the following prayer is based, are as follows:

The lot No. 13, as specified and described in the declaration, need not be repeated here.

The defendant claims the corner portion thereof, nineteen feet on Baltimore street, and thirty-six feet on South street, as leasehold, in relation to which he adduces the following title, as that under which the said Rachel Colvin held the same at the time of her death: said corner lot is portion of a lot 36 feet on Baltimore street by 36 feet on South street, leased by Nicholas Rogers to Jacob Welsh for 99 years,

renewable forever, by deed of the 16th of July 1777, recorded in liber W. G., No. A, folio 168, subject to an annual ground-rent of £16 sterling. Said corner portion of 19 by 36 was assigned by Walsh to Usher and others, by deed dated the 29th September 1785, and recorded in liber W. G., No. X., folio 397, and subject to an annual rent of £8 sterling, payable to Nicholas Rogers, his heirs or assigns; and Usher and others assigned said portion to Patrick Colvin, the father of said Rachel, by deed dated 29th November 1792, recorded in liber W. G., No. K. K., folio 126, subject however to said last mentioned rent. The said Rachel Colvin, as the only surviving child and representative of her father, became entitled to the lease-hold interest in said portion assigned to said Patrick Colvin, and upon the fourth day of March 1823, by paper of that date, acknowledged and recorded in liber W. G., No. 167, folio 132, she purchased and sought to have conveyed to her by Lloyd N. Rogers, the only child and heir of said Nicholas, the reversion in said portion (19 by 36) of the entire lot 36 by 36, leased by said Nicholas as aforesaid. Said paper signed by said Lloyd N. Rogers was not sealed by him, and said Rachel has not paid any ground-rent to said Lloyd N. Rogers or any one since said 4th day of March 1823.

The defendant also proved that since the institution of the suit he had caused the land records of Baltimore City to be carefully searched, but was not able to find among said records any other deed or paper writing from Nicholas Rogers or his heirs or assigns, conveying or purporting to convey the reversion or any interest therein (except those above mentioned) in the portion 19 by 36, of lot No. 13 above mentioned.

(The defendant has the original deed or copies thereof above mentioned, and ready to produce, which by agreement may be read in evidence by either party.)

The plaintiffs pray the Court to instruct the jury, that upon the evidence thus offered by the defendant, the said property (19 by 36) is in law to be regarded as real and not lease-hold property.

And the defendant by his counsel submitted the following prayers:

The defendant prays the Court to instruct the jury, as follows:

1st. That the lessors of the plaintiff cannot recover in this case as heirs at law of Rachel Colvin, unless they prove that said Rachel Colvin died seized of the real estate sued for, or some part of the same, and that they are the heirs at law of the said Rachel or some of them.

2d. That if the jury shall find that the lessors of the plaintiff claim to be eight of eleven heirs at law of the said Rachel Colvin, and as first cousins of said Rachel on the part of the mother, then the said lessors of the plaintiff cannot recover in this action, unless they prove the death of all the maternal uncles and aunts of said Rachel in her life time, and unless they also prove that there were no more than eleven, or if more, the number of first cousins of the said Rachel living at the time of her death, and that the burden of proving the death of said uncles and aunts before the said Rachel, and that there were no more cousins than eleven, or if more, the number living at her death, is upon the lessors of the plaintiff.

The 3rd, 4th, 5th and 6th of the defendant's prayers, rejected by the Court below, are here omitted.

7th. That if the jury find from the evidence that Rachel Colvin, during the years 1844, 1845, 1846, 1847, and in 1848, both before and after 6th April in the last year, made leases and contracts, and bought and received conveyances of and conveyed real estate, and attended to or directed the collection of her rents, and gave or directed receipts to be given for the same, and that the validity of any such leases, contracts, receipts or conveyances were never questioned, then the jury may infer from such facts, taken in connection with all the evidence in the cause, that the said Rachel Colvin was of sound and disposing mind, and capable of executing a valid deed or contract when the will of the 30th October 1845, and that of 1847, spoken of

by the witness Teackle, and of the 6th April 1848, were respectively executed, if the jury should find that such wills were executed.

The Court granted the 3d, 4th, 5th, 8th, 9th, 10th and 11th prayers of the lessors of the plaintiffs, and the 1st, 2nd and 7th of the defendant, and rejected the 1st, 2nd, 6th and 7th prayers of the lessors of the plaintiff, and granted the following instructions:

"I reject the plaintiffs' first and second and sixth prayers, and instruct the jury as follows:

"1st. If the jury find from the evidence in this cause, that Rachel Colvin became insane from disease, and that such insanity was not transitory in its character, but was of a permanent and continuing nature, then the burden of proof is upon the defendant to show that any will except the will of the 6th of April 1848, executed subsequently thereto, (if the jury shall find that any such was executed,) was executed by the testatrix after her recovery from the said insanity or during a lucid interval, and that she was at the time of executing the same of sound and disposing mind, and capable of executing a valid deed or contract.

"2d. If the jury find from the evidence that Rachel Colvin was under the influence of any insane delusion or delusions with respect to the disposition of her property, then any will executed by her, which was the direct consequence and offspring of such delusion or delusions, is inoperative and void. And that the meaning of an insane delusion, in its legal sense, is, the belief in things impossible, or the belief in things possible, but so improbable under the surrounding circumstances, that no man of sound mind could give them credit.

"3d. If the jury find from the evidence that Rachel Colvin was under the influence of any insane delusion or delusions permanently fixed on her mind at the time the wills of the 30th of October 1845, or of the 6th of April 1848, or of 1847, or any of them referred to in this case, were executed by her, (if the jury shall find that the said will or

wills were executed by her,) although they shall find that the said wills, or any of them, were not the direct consequence and offspring of the said delusion or delusions; yet it is a question for the jury to determine, whether the intellect of the testatrix was so disordered as to have rendered her at the time of executing the said will or wills, not of a sound and disposing mind, and capable of executing a valid deed or contract.

"4th. That although the jury should find from the evidence that Rachel Colvin was, at the time she executed the will or wills mentioned in the preceding instruction, perverted in her moral feelings or affections, such perversion, unless accompanied by insane delusion or delusions, is not sufficient to invalidate the said will or wills.

"5th. That if the jury find from the evidence in the cause, that Rachel Colvin was at the time of executing the will or any of them referred to in this case, of sound and disposing mind, and capable of making a valid deed or contract, then she was in the possession of that description of mental capacity which is required by the testamentary Act of 1798, ch. 101, sub-ch. 1, sec. 3, and that the meaning of the words, sound and disposing mind and capable of making a valid deed or contract in respect to the disposition of her property by last will and testament, is, that she must have had sufficient capacity at the time of executing the said will or wills 'to make a disposition of her estate with judgment and understanding in reference to the amount and situation of her property, and the relative claims of the different persons who should have been the objects of her bounty.' But the meaning of the words, judgment and understanding, is not that the jury should reject the will or wills because they may believe that they were in their provisions unjust or injudicious, although the provisions of the will or wills may be considered by them in deciding the question as to the capacity or incapacity of the testatrix.

"This is explanatory of the first instruction.

"The principle of law stated in the first instruction is, that if the jury find from the evidence that Rachel Colvin was insane from disease, and that such insanity was permanent and continuing, and not temporary in its nature, then the burden of proof was on the defendant to show that any will executed by the said Rachel Colvin subsequent thereto, was executed by her after her recovery from such insanity, or during a lucid interval. The burden of proving that the will of the 6th April 1848, was executed by Rachel Colvin after she recovered from such insanity or during a lucid interval, if the jury should find the existence of permanent and continuing insanity, is discharged by the production in evidence of the probate, which is *prima facie* evidence of her capacity at the time the said will was executed, (if the jury should find such probate,) and the burden of proof is then shifted, and it is then incumbent on the plaintiffs to overcome by evidence the presumption of capacity arising from the probate. The objection to confining the general principle stated in the instruction to the wills of 1845 and 1847, and excluding the will of the 6th of April 1848, on the ground of the probate, is that by so doing the Court assumes the existence of the probate, which is a fact to be found by the jury as stated in the defendant's 5th prayer, which I adopted.

"As the counsel for the plaintiffs preferred that the instruction should be framed as it now stands, I had no objection to modify it as it, was an instruction given as a substitute for one of their prayers. In either way proper effect is given to the probate.

"The plaintiffs' 7th prayer is rejected, and I give to the jury the following instruction:

"That if the jury find from the evidence in the case, that the will of 1847, mentioned in the testimony of Mr. Teackle, was executed by Rachel Colvin in the presence of three creditable witnesses, who attested the same in her presence, that the said will was signed by her in their presence when she was of sound and disposing mind, and

capable of making a valid deed or contract, and that the said will of 1847, contained an express clause of revocation, and was intended by Rachel Colvin to revoke all former wills, and that the said will of 1847, was destroyed by the defendant without the knowledge or consent of the said Rachel Colvin; or was destroyed or ordered to be destroyed by her when she was not of sound and disposing mind, and capable of making a valid deed or contract, then the said will of the 30th of October 1845, cannot be set up by the defendant in this case.

"In rejecting the plaintiffs' 7th prayer, the Court did not think it necessary to decide whether there was or was not evidence from which he could find that the will of 1847, was fraudulently destroyed by the defendant, because in the opinion of the Court, if the will of 1847 was destroyed by the defendant, with or without fraud, then the will of the 30th of October 1845, could not be set up as a defence in this action."

And the Court rejected the 3rd, 4th, 5th and 6th prayers of the defendant, and granted the following instructions:

"I reject the defendant's fifth prayer, and in its place give to the jury the following instructions:

"1. If the jury find from the evidence that the testamentary paper offered in evidence in this case, as the will of Rachel Colvin of the 6th of April 1848, was signed by her in the presence of three creditable witnesses, who, at her request, and in her presence, subscribed their names as witnesses thereto; and that at the time of the signing and attestation of the said will, the testatrix was of sound and disposing mind, and capable of executing a valid deed or contract, and that all the real estate demanded in this suit, was devised by the said will to others than the lessors of the plaintiff, then she did not die intestate, and the plaintiffs are not entitled to recover.

"2nd. That although the jury may find that the paper of the 6th of April 1848, was not a valid and operative will,

yet if they find that Rachel Colvin in the manner stated in the preceding part of this instruction, executed as her will the paper referred to as the will of the 30th of October 1845, when she was of sound and disposing mind, and capable of making a valid deed or contract, and that the said paper devised the real estate demanded in this action to others than the lessors of the plaintiff; and shall further find that the said Rachel Colvin signed, executed and published, when she was of sound and disposing mind, and capable of making a valid deed or contract, the paper referred to in the testimony of Mr. Teackle as the will of 1847, in the presence of three creditable witnesses, who attested the same in her presence, and that the said paper contained an express clause of revocation, and was intended by her to revoke all prior wills, and that it was destroyed by her, then the presumption is, that by the destruction of the paper of 1847, she intended to revive the will of the 30th of October 1845, subject to be rebutted by the facts and circumstances in the cause; and if they find that Rachel Colvin, by the destruction of the paper of 1847, intended to revive the will of the 30th of October 1845, then the said Rachel Colvin did not die intestate, and the plaintiffs are not entitled to recover.

"But if the jury find that by the destruction of the paper of 1847, the said Rachel Colvin did not intend to revive the will of the 30th of October 1845, then that will is inoperative and void, although they shall find that the contents of the said paper of 1847, with the exception of the express clause of revocation, has not been proved.

"Defendant's 6th prayer rejected, and as a substitute I instruct the jury as follows:

"I instruct the jury that the probate which has been offered in evidence by the defendant, in case the jury shall find such probate from the evidence in the cause of the paper writing, purporting to be the testament and last will of Rachel Colvin, bearing date the 6th day of April 1848, also offered in evidence by the defendant, is *prima facie* evi-

dence, as to her real estate, that the said paper writing is her testament and last will, and that the burden is upon the plaintiff to shew that said paper writing is not her testament and last will as to her real estate.''

To which granting by the Court of the prayers of the lessors of the plaintiff, and each of them, and to the refusal by the Court to grant the defendant's prayers, and each of them, and the giving of all of the instructions of the Court, and to each of said instructions, the defendant by his counsel excepted, and the verdict of the jury and judgment being in favor of the plaintiff, appealed to this Court.

The cause was argued before BOWIE, C. J., and GOLDSBOROUGH and COCHRAN, J.

*F. W. Brune* and *Wm. Schley,* for the appellants :

The questions presented in the record for the revision of this Court, relate principally to these three:

1st. As to the rule, by which the testamentary capacity of the testatrix, at the periods of the execution of the several wills of 1845, 1847 and 1848, should be measured.

2nd. As to the legal operation and effect of the execution and subsequent destruction of the will of 1847, upon the will of 1845; and more especially, whether the plaintiffs below (appellees here) could set up said will of 1847, as an operative revoking instrument, and so prevent the defendant from claiming as devisee, under the will of 1845, in case the will of 1848 should be found to be invalid and inoperative as to the real estate of said testatrix.

3rd. And as to the legal operation and effect of the execution and destruction of the will of 1847, upon the rights of the plaintiffs, as heirs at law of said testatrix.

Besides these principal questions, and which are presented in various aspects, in the several prayers, there were subsidiary and inferior questions presented and decided, and which are fully stated in the several exceptions.

The appellant contends :

I. That the Court erred in permitting the declaration of Dr. Teackle, the deceased witness, to the will of 1848, to be given in evidence by his brother, under the circumstances stated in the defendant's 1st exception. *Townshend vs. Townshend,* 9 *Gill,* 506. *Stobart vs. Dryden,* 1 *M. & W.,* 614, 627. *Wilson vs. Boerem,* 15 *Johns.,* 290.

*Townshend vs. Townshend,* was decided by a divided Court and will not be extended. At the trial of this cause below, the plaintiffs proved the attestation of the deceased witness and then sought by his declarations, not only to discredit his attestation, but thus furnish affirmative proof of the testatrix's mental unsoundness. We do not stand on the attestation and the high character of the subscribing witnesses, but on the *prima facie* case made by the probate. Act of 1831, ch. 15. *Warford, et al. lessee, vs. Colvin,* 14 *Md. Rep.,* 532. *Crane vs. Lessee of Morrow,* 6 *Peters,* 62.

II. That the instructions of the Court in regard to the true rule, or standard of testamentary capacity of the testatrix, were calculated to mislead the jury and were erroneous, and that the rule, or standard of capacity as applicable to the several wills in controversy, should have been submitted to the jury in the language of the Act of 1798, and they should have been instructed, that in estimating the capacity of the testatrix, according to this rule or standard, they should take into consideration all the testimony in the cause, instead of having their attention specially called to particular and isolated facts set out in several of the plaintiffs' prayers. The Act of Assembly prescribes, that the legal capacity to devise shall be equal to the capacity necessary to make a valid deed or contract, while in some of the States an inferior capacity is held sufficient for a valid devise. Act of 1798, ch. 101, sub-ch. 1, sec. 3. *Davis vs. Calvert,* 5 *G. & J.,* 299, 300. *Harrison vs. Rowan,* 3 *Wash. C. C. R.,* 585, 586. *Stevens vs. Vancleve,* 4 *Ibid.,* 267. *McMaster vs. Blair,* 29 *Penna.,* 299, 302, 303, 304. *Comstock vs. Hadlyme,* 8 *Conn.,* 264, 265.

*Hathom vs. King,* 8 *Mass.,* 372. *Sutton vs. Sutton,* 5 *Harr.,* 461. *Stewart vs. Lispenord,* 26 *Wend.,* 255, 306. *Brown vs. Toney,* 24 *Barb.,* 585, 586, 587. *Kirkwood vs. Gordon,* 7 *Richardson,* 479, 480. *Taylor vs. Kelly,* 31 *Ala.,* 72. *Ben. Mercer vs. Kelso,* 4 *Crattan,* 106, 120. *Potts vs. House,* 6 *Georgia,* 356. *Horne vs. Horne,* 9 *Iredell,* 106. The explanatory instruction is open to the further objection, that it submits the question of probate or no probate of the will of 1848, to the finding of the jury, which was a question of law. *Rees vs. Stillee,* 38 *Pa. S. R.,* 143. *Fells' Pt. Sav. Inst. of Balt. vs. Weedon,* 18 *Md. Rep.,* 328. *Cook's Lessee vs. Carroll,* 6 *Md. Rep.,* 104.

III. That the Court erred in permitting the jury in estimating the testamentary capacity of the testatrix, in reference to the wills in controversy, to take into consideration *any degree of influence which* the defendant may have exerted in reference to any of her wills, not distinguishing between legitimate and illegitimate influence, and having no regard to the particular wills in controversy, as the result of such influence. *Davis vs. Calvert,* 5 *G. & J.,* 301, 302. *Shelford on Lunacy,* 329, 2 *Law Lib.,* 209. *Sutton vs. Sutton,* 5 *Harr.,* 461. *Taylor vs. Kelly,* 31 *Ala.,* 70. *O'Neal vs. Farr,* 1 *Rich.,* 80. *Potts vs. House,* 6 *Geo.,* 359, 364. *Stultz vs. Shoeffle,* 18 *Eng. L. & Eq. R.,* 576. *Williams vs. Goude,* 3 *Eng. Eccl. Rep.,* 254.

IV. The Court erred in permitting the jury to take into consideration the declarations of the testatrix, made in 1849, stated in plaintiffs' 10th prayer, as evidence of her insanity at the date of the execution of the will of April 1848. *Jackson vs. Kniffer,* 2 *Johns.,* 31. *Wilson vs. Boerem,* 15 *Johns.,* 290, 291. *Jackson vs. Betts,* 6 *Cowen,* 382. *Comstock vs. Hadlyme,* 8 *Conn.,* 263,264. *Smith vs. Fenner,* 1 *Gall.,* 172. *Provis vs. Reed,* 5 *Bing.,* 437. *Stevens vs. Van Cleve,* 4 *Wash.,* 265.

V. That the execution of a will in 1847, even if it be conceded that it contained a clause of revocation, did not affect the previously existing and validly executed will of 1845, inasmuch as such will of 1847 was not a valid sub-

·sisting will at the period of the testatrix's death. That said will of 1847 having been shown to be in the possession of the testatrix, and not being in existence at her death, is presumed to have been destroyed by her *animo cancellandi;* and that the destruction of the will of 1847, by the testatrix, *ipso facto* restored the will of 1845 to its original condition as an ambulatory will; and if the same was her *last* valid will at the time of her decease, it would operate and have effect as a valid devise of real property, without the necessity of any finding by the jury of any intentions of the testatrix at the time of the destruction of the will of 1847, to revive the will of 1845. Act 1798, ch. 101, sub-ch. 1, sec. 4. 1 *Jarman on Wills*, 122, 158. *Goodright vs. Glazier*, 4 *Burr.*, 251, 252. *Harwood vs. Goodright*, 1 *Cowp.*, 87, 93. *Marsh vs. Marsh*, 3 *Jones' Law*, 77. *In re Colvin*, 3 *Md. Ch. Dec.*, 284. *Brown vs. Brown*, 92 *Eng. C. L. Rep.*, 881. 1 *Pow. on. Dev.*, 528, 21 *Law Lib.*, 309, note. *Deakins vs. Hollis*, 7 *G. & J.*, 311. *Carey, et al., vs. Dennis & Wife*, 13 *Md. Rep.*, 1. *Jarman on Wills*, 761. *Bertenshaw vs. Gilbert*, *Cowp.*, 29, ·32, misquoted in 1 *Pow. on Dev.*

· VI. But if the will of 1847 should be found to have been destroyed by the testatrix, when of unsound mind, or by some other person without her consent, then the appellant contends that the said will of 1847 cannot be set up by the appellees as a valid revoking will, because its execution and contents, as a devising will, are not sufficiently and legally proved, and because it was not intended by the testatrix to have effect to revoke the previous will, unless it could be set up and proved as a valid and complete will. A written instrument cannot be made evidence for any purpose, unless its entire contents are substantially and sufficiently proved. If its contents were not sufficiently proved to entitle the will of 1847 to probate, they were not sufficiently proved to enable the plaintiffs to set it up as a revoking will. More particularly was there not legal proof of an express clause of revocation in said will. 1 *Jarman*

*on Wills,* 153, 154.    *Eccleston vs. Speke, Carthew,* 79.
*Limbery vs. Mason, Com. Rep.,* 451.    *Onion vs. Tryer,* 2
*Vern.,* 742, 1 *P. Wms.,* 343.    *Semmes vs. Semmes,* 7 *H. &*
*J.,* 390.    *Laughton vs. Atkins,* 1 *Pick.,* 535, 543, 545 and
549.    *Barksdale vs. Barksdale,* 12 *Leigh.,* 541, 546, 547.
*Pringle vs. McPherson,* 2 *Brevard,* 289.    *Rhodes vs. Vin-
son,* 9 *Gill,* 167, *Davis vs. Sigourney,* 8 *Met.,* 487.    *Flack
vs. Green,* 3 *G. & J.,* 480.    *Ex-parte Ilchester,* 7 *Ves.,* 372,
381.    *Massey vs. Massey,* 4 *H. & J.,* 141.

VII.  If it should be held that the execution and contents
of the will of 1847 were sufficiently proved, so as to justify
the Court in submitting it to the jury, to be found to be a
valid revoking will, not legally destroyed, then the Court
was equally bound to instruct the jury that the plaintiffs,
in thus setting up said will, barred their own claim as heirs
at law, inasmuch as said will is clearly proved to have de-
vised her entire estate away from the appellees and every
of them.    *McElfresh vs. Schley,* 2 *Gill,* 181, 200, 202.
*Streathfield vs. Streathfield, White's Eq., Ca.,* 252. 65 *Law
Lib.,* 252, 278.    *Irvin vs. Tabb,* 17 *S. & R.,* 419, 423.
*Adam vs. Yard,* 1 *Rawle,* 163, 171.    2 *Smith Lead. Ca.,* (5
*Am. Ed.,*) 192, 196, 198.    *Floyd vs. Floyd,* 3 *Strob.,* 54,
55.    *Lang vs. Eakle,* 4 *Md. Rep.,* 457.    *Hagan vs. Hendry,*
18 *Md. Rep.,* 192.

VIII.  That at least the specific devises to Mrs. Ellicott,
Miss Warford, the City of Baltimore for a House of Refuge,
and the servants, proved to have been contained in said
revoking will, should have been excepted, and the plaintiffs
declared not entitled to recover these specific devises.    *Steele
vs. Price,* 5 *B. Monroe,* 72.    *Jackson vs. Jackson,* 4 *Mis-
souri,* 210.

IX.  That the Court erred in granting the plaintiffs' 11th
prayer, and in instructing the jury that the property men-
tioned in said prayer was, as a matter of law, *real* and not
*lease-hold* property of the testatrix.

The proof showed that before 1823, the testatrix, as next
of kin of her father, was the owner of the lease-hold interest

in the property referred to in the prayer, and this possession and ownership continued till her death, unless a merger of the reversion was shown by the plaintiffs to have taken place, by a deed duly executed and recorded; while under the paper writing from Lloyd N. Rogers to the testatrix, she acquired at most an *equitable estate,* in the reversion in the lot of ground therein mentioned. The words "in testimony whereof, I have hereunto set my hand and affixed my seal," in the body of the instrument, are not sufficient without the scroll. *Stabler vs. Cowman,* 7 *G. & J.,* 287. The proof also showed that no deed, acknowledged and recorded for such reversion, could be found. Under these circumstances the Court should not even have instructed the jury that *they might presume a deed* to the testatrix of the reversion, for the benefit of the heirs, as against the personal representative; continuing the original possession of the property and whose right was established by the probate of the will of 1848. *A fortiori* was the instruction erroneous in declaring, without any finding on the part of the jury, that, as a matter of law, the said lot of ground was to be regarded as fee-simple and not lease-hold property. Act of 1715, ch. 47, sec. 8. 1794, ch. 57. Act of 1785, ch. 72, sec. 11. *Cockey vs. Smith,* 3 *H. & J.,* 27, 28. *Carroll vs. Norwood,* 5 *H. & J.,* 157, 162, 173. *Wilson vs. Inloes,* 11 *G. & J.* 351, 358. *Casey vs. Inloes,* 1 *Gill,* 430, 497, 504, 555. *Hammond vs. Inloes,* 4 *Md. Rep.,* 138, 172, 173. *Owings vs. Norwood,* 2 *H. & J.,* 96, 106, 107, 111. *Mundill vs. Clerklee,* 3 *H. & J.,* 462, 468. *Ford vs. Gwinn, Ib.,* 496. *Bridges vs. Chandos,* 2 *Burr.,* 1072, 1075. *Mayor, &c., vs. Horner,* 1 *Cowp.,* 102. *Jones vs. Jones,* 7 *Term,* 45, 47. *Best on Presumptions, ch.* 6, 47 *Law Lib.,* 119. *Matthews vs. Ward,* 10 *G. & J.,* 455, 456.

*Merger* takes place where the legal and equitable estates are in the same person, in juxta-position, and coalesce. There can be no *merger* where there is an intervening estate. If so, then comes in the doctrine of *attendant terms,*

which required that the two estates shall be legal and in the same person. *Preston on Merger*, 27, 28. 42 *Law Lib.*, 25. 9 *Md. Rep.*, 127. *Whitchurch vs. Whitchurch*, 2 *P. Wms.*, 237.

*G. L. Dulany*, for the appellees :

I. The appellees contend, that their prayers and the instructions of the Court relating to the testamentary capacity of Rachel Colvin, rest upon just legal principles.

1. In support of the propositions of law asserted in the appellees' 3d prayer, see *Mark vs. Tyrell*, 4 *Eng. Eccl. Rep.*, 41. *Same Case, Ib.*, 33. *Groom vs. Thomas*, 4 *Eng. Eccl. Rep.*, 190, 191. *Dodge vs. Merch*, 3 *Eng. Eccl. Rep.*, 270, 267. *Mead vs. Bryan*, cited in *Dorsey's Test. Law*, 147. *Ross vs. Chester*, 3 *Eng. Eccl. Rep.*, 96, 97. *Hoby vs. Hoby*, 3 *Eng. Eccl. Rep.*, 69, 70, and 75.

2. The 4th prayer of the appellees is sustained by the case of *Groom vs. Thomas*, above cited.

3. The 5th prayer of the appellees is sustained by the case of *Davis vs. Calvert*, 5 *G. & J.*, 269.

The foregoing with the 9th and 10th of the appellees' prayers, all of which were granted by the Court below, comprehend all the instructions given on the subject of testamentary capacity.

The objection in the Court below to the admissibility of the declarations of Dr. Teackle, one of the attesting witnesses in the will of 1848, since deceased, should have been specific, pointing out distinctly and specifically the grounds of the objection. *Pegg vs. Warford*, 7 *Md. Rep.*, 582. *Townshend vs. Townshend*, 9 *Gill*, 506.

II. The next point to be considered is, whether or no the will of 1845 was revived by the destruction of the will of 1847. We contend that the Court properly rejected the 3d and 4th prayers of the defendant, which related to this subject, and the instructions given as a substitute for them by the Court, and the 7th prayer of the plaintiffs cannot be properly objected to, at least by him.

48    v. 20.

The true rule is, that when one will is annulled by a subsequent one, it cannot afterwards be revived except by republication or some other formal and direct act. *Bohannon vs. Walcot,* 1 *How.* (*Miss.*) *Rep.*, 336, 339. *James vs. Marvin, et al.*, 3 *Connect.*, 576. *Legare & Wife vs. Ashe, et al.*, 1 *Bay* (*S. C.*) *Rep.*, 464, 465. *Simmons vs. Simmons*, 26 *Barb.*, 68, 76, 77. *Walton vs. Walton*, 7 *John. Ch. Rep.*, 256, 268, 269.

In this last case Chancellor Kent says: "If a will be once absolutely revoked, whether directly or impliedly, it must be gone forever. It cannot be restored without due republication." It is important here to observe that the rules as to revocation of wills, are the same in law and equity. 7 *John. Ch. Rep.*, 268.

The same principle has been expressly decided in England, *ex-parte Hellier*, 3 *Atk.*, 798. Better reported in 5 *Eccles. Rep.*, 416, under the title of *Helyar vs. Helyar. Burtenshaw vs. Gilbert, Cowp.*, 29, 32. *1st pt. Powell on Devises*, 21. *Law Lib., m. pp.* 549, 551.

This ancient rule of the law has statutory conformation. By force of 1 *Vict.*, 126, *sec.* 2, no will (made after 1838,) revoked by the execution of another will, can be revived except by re-execution, or by a codicil duly executed. See 1 *Jar. on Wills*, (5 *Lond. Ed.*,) 114. *Cutto vs. Gilbert*, 9 *Moore* (*P. C.*) *Cases*, 142, 143. See also the remarks and decision of Sir Herbert Jenner Fust, upon this provision of the Statute of Victoria. *Major vs. Williams*, 7 *Eccles. Rep.*, 454.

In *Jarman on Wills*, (5 *Lond. Ed.*,) 114, however, directly the contrary doctrine to that which has been contended for above, is asserted. It is there maintained that the destruction of a revoking will, *ipso facto*, revives a prior one in existence at the time of such destruction. The chief authorities relied upon for the above position, are a dictum of Lord Mansfield's in *Harwood vs. Goodright, Cowp.*, 50, and the case of *Goodright vs. Glazier*, 4 *Burr.*, 2512. With all due deference, however, to the opinion of so emi-

nent a jurist as Mr. Jarman, we must be permitted to say that we do not think he is sustained in the proposition which he has laid down by either of the precedents to which he has referred.

The authorities to which we have been referring, especially the dictum of Lord Mansfield, in *Harwood vs. Goodright,* when cited by counsel in support of the extreme doctrine above noticed, have been severely criticised by the Courts as well of this country as of England; and, by some of the judges, even their authenticity has been questioned. See *Simmons vs. Simmons,* 26 *Barb.,* 77. *Moore vs. Moore,* 1 *Eng. Eccl. Rep.,* 123. See, also, Dr. Phillimore's remarks upon the unreasonableness of the doctrine supposed to be laid down by Lord Mansfield. *Moore vs. Moore,* 1 *Eccl. Rep.,* 128 and 129, 135 and 136. In the same manner the Courts have criticised and doubted the other authority relied upon by Mr. Jarman. See *Bohannon vs. Walcot, et al.,* 1 *How. (Miss.) Rep.,* 339. *Wilson vs. Wilson,* 1 *Eng. Eccl. Rep.,* 472.

*James vs. Marvin, et al.,* 3 *Connect. Rep.,* 576, C. J. Hosmer, a judge, whose opinions (as was stated by his Honor, Judge Martin, in delivering his opinion in the present case) were regarded with the highest veneration by the Court of Appeals, which existed under the old Constitution, draws a distinction between a case where a will has been revoked by a second, having an express clause of revocation, and one where it is only impliedly revoked, and holds that the decision in 4 *Burr.,* has no application in the case of the former.

In the present case we have the testimony of Mr. Teackle, that according to his belief, he inserted an express clause of revocation in the will of 1847. He stated that it was his invariable custom to insert such a clause in every will which he drew, those of the testatrix included. This evidence of Mr. Teackle was competent, and properly submitted to the jury by the Court. *Brown vs. Brown,* 92 *Eng. C. L. Rep.,* 883, and *Ib.,* 887.

3. But whether the rule for which we have above contended, that a will once revoked can never be revived except by some writing properly adapted to the purpose, or other formal act, be correct or not, we mean to maintain that the principle upon which the instructions of the Court are founded, is fully sustained by the authorities.

That principle is this, that where a second will revoking a prior one, is destroyed by the testator, the first is *prima facie* intended to be revived; but that this presumption is liable to be rebutted, and that it is for the jury, from all the circumstances of the case, to decide whether or not there was an intention on the part of the maker of the will to revive. *Moore vs. Moore*, 1 *Eccl. Rep.*, 128, 129, *Wilson vs. Wilson*, *Ib.*, 467. *Usticke vs. Bawden*, 2 *Ib.*, 254.

We have already noticed the fact that there is not the slighest evidence in the record to show, that at the time of the destruction of the will of 1847, Miss Colvin intended to revive the will of 1845. The whole of the testimony is directly opposed to any such supposition.

III. But there is one ingredient in the present case, hitherto unnoticed, which clearly renders the instructions of the Court, however correct in the abstract, entirely too favorable to the defendant.

1. We have uncontradicted evidence of the strongest kind, to show that the will of 1847 was destroyed by the appellant, without the knowledge or consent of the testatrix, and in order, as he himself in effect stated, that if he did not succeed in establishing the will of 1848, he might fall back upon that of 1845. This made Warford guilty of fraud, and constituted him a spoliator; than which there is no character more odious in the law. "It is better, surely," says Mr. Justice Rogers, in the case of *Jones vs. Murphy*, 8 *Watts & Serg.*, 275, 500, "that a person should die intestate than that a spoliator should be rewarded for his villiany."

2. In 1 *Jarman on Wills*, (by *Perkins*,) *top p.* 118, *m. p.* 118, note 1, the following case is cited: "A will made

many years before, believed by the testator to be destroyed, but detained by one of the devisees to prevent its being can-celled or altered, is thereby avoided.''

3. This fact of fraud, then, as a subtle poison, diffuses itself over the whole case, and must operate prejudicially to the defendant in all the questions which arise in it; the time-honored maxim being that *omnia praesumuntur contra spoliatorem. Jones vs. Murphy*, 8 *Watts & Serg.*, 275. *Broom's Max.* (*Ed.* 1854,) *mar. pp.* 725, 726, contained in 1 *Lib. Law & Eq.*

IV. The third and fourth prayers of the defendant were properly rejected by the Court.

1. The position assumed by these prayers is either that a will may be set up as a bar to a party's right of recovery in an action of ejectment, although its contents cannot be proved with sufficient distinctness to make it operative in whole or in part, as a will; or, that a paper may be set up and operate as a will, notwithstanding the fact that its contents are but partially established, so far forth as they are established; and this, although the testimony offered is so vague and uncertain, as not to specify the quantity or particular description of property left to any one of the devisees. In support of the ruling of the Court upon these prayers, we refer to *Pegg vs. Warford*, 7 *Md. Rep.*, 582. 8 *Watts & Serg.*, 294.

2. Before a will which has been lost or destroyed can be set up as a bar to an action of ejectment, its contents must be proved with the same exactness that is required to make it operative as an instrument to vest the estate in the devisee. *Davis vs. Calvert*, 5 *G. & J.*, 302, 303.

In *Gittings' Lessee vs. Hall*, 2 *H. & J.* 125, C. J. Chase says: "The defendant may prevent his (the plaintiff's) "recovery by showing a title in himself, or by showing a clear subsisting title in a stranger." A clear subsisting title outstanding in another, means such a title as the stranger could recover on in ejectment, against either of the contending parties."

3. But before a will which has been lost or destroyed, can be used as a title to sustain an action of ejectment, or indeed be set up at all, there must be clear and satisfactory evidence of the whole of the contents.  *Rhodes vs. Vinson,* 9 *Gill,* 169, 170.  *Davies vs. Sigourney,* 8 *Met.,* 487, 488. *Posten vs. Bassette,* 5 *Ca.,* 467.  1 *Jar. on Wills,* 118.

4. This rule applies *a fortiori* in the present case because of Warford's fraud in destroying the will of 1847.

V. The appellees will contend that the Court below committed no error in determining that the 19 feet of ground of the lot at the corner of South and Market streets was real estate.  6 *Bing.,* 19 *Eng. C. L. Rep.,* 44.  *Cowp.,* 45. *Matth. Pres. Ev., Livingston's Exs. vs. Livingston.*  4 *Johns. Ch. R.,* 294, *Hillary vs. Waller.*  12 *Ves., Jr.,* 250.

*Wm. Price,* on the same side :

The law as expounded by the Court below, in the prayers rejected and the instructions given to the jury, will be found to affirm the following propositions, which we shall maintain in their order:

1. The clause of revocation in the will of 1847, was according to all the authorities, a separate instrument operating apart from the will.  The will itself may be ambulatory, but the clause of revocation is not, it takes effect immediately that it is executed.

This proposition lies at the foundation of the argument: *James vs. Mervin,* 3 *Conn. Rep.,* 576.  *Simmons vs. Simmons,* 26 *Barb. Supreme Ct. Rep.,* 77.  1 *Powell on Dev.,* 528.  *Walton vs. Walton,* 7 *John. Ch. Rep.,* 269, 270. *Barksdale vs. Hopkins,* 23 *Georgia Rep.,* 335.  *Brown vs. Brown,* 92 *Eng. C. L. Rep.,* 885.  2 *Dall.,* 266.

2. The destruction of the will of 1847, by Miss Colvin, would revive the will of 1845, if such were her intention. And in the absence of all proof of intention, the presumption of law is, that it was the intention to revive.  The Court below gave the defendant the benefit of this presump-

1.  *Rhodes vs. Vinson,* 9 *Gill,* 170.  *Semmes vs. Semmes,*

Colvin *vs.* Warford, et als. Lessee.

7 *H. & J.*, 388. *Bell vs. Lynn,* 2 *G. & J.*, 391 and 363. *Casey's Lessee vs. Inloes,* 1 *Gill,* 505.

3. If the will of 1847 was destroyed by any person other than Miss Colvin, or by her when not of capacity to make a will, there could be no presumption because there could be no intention. *Rhodes vs. Vinson,* 9 *Gill,* 170.

4. If the will of 1847 was destroyed by any person other than Miss Colvin, or by her when not of capacity to make a will, the will of 1845 is not revived.

5. The question of fraud is therefore not necessary to the decision of the case, though if fraud in fact be made out, it adds great force to the facts on which the question of the revival of the will of 1845 depends.

6. We shall maintain, that the will of 1847 was not destroyed by Miss Colvin, and therefore, the will of 1845 was not by that destruction revived.

7. It matters not by whom it was destroyed, if not by Miss Colvin, or by her direction, the result is the same, the will of 1845 is gone and cannot be set up to defeat the heirs at law. From the facts in the record, it is violently presumptive, that the will of 1847 was destroyed by Colvin.

8. On the point of testamentary capacity, with reference to the question of insanity, see 1 *Beck. Med. Jur.*, 554. 4 *Eng. Eccl. Rep.*, 185 to 190. 2 *Phil. Ev.*, 295. *Cartwright vs. Cartwright,* 1 *Eng. Eccl. Rep.*, 51, 53, 59. *Davis vs. Calvert,* 5 *G. & J.*, 300. *Dor. Test. Law,* 144 to 146.

COCHRAN, J., delivered the opinion of this Court:

This is an appeal from a judgment obtained by the appellees in a suit brought to recover possession of certain parcels of real estate, claimed by them as heirs at law of Rachel Colvin.

For the purpose of defeating the claim set up by the appellees, the appellant offered in evidence a will executed by Rachel Colvin on the 6th of April 1848, with the proceedings upon which it had been admitted to probate after the trial of issues, and also a will, executed by her on the

30th of October 1845, in both of which he was named devisee of the property in question. The appellees then offered a mass of testimony, to show that these wills were made when she was of unsound mind, and incapable of executing a valid will, and that their execution was induced by the impression and undue influence of the appellant. They also proved that another will, containing a clause revoking previous wills, was executed by her some time in the year 1847. During the course of the trial, the appellant reserved two exceptions. The 1st of these exceptions was taken to the admission of evidence of certain declarations made by Dr. Teackle, then deceased, who attested the execution of the will of 1848, and the 2nd to the granting of the appellees' 3rd, 4th, 5th, 8th, 9th, 10th and 11th prayers, and the rejection of the appellants' 3rd, 4th, 5th and 6th prayers, and also to the instructions given by the Court in lieu of the rejected prayers on both sides. The appellees' 3rd, 4th, 5th, 9th and 10th, and the instructions given in lieu of the 1st, 2nd and 6th prayers, with the instructions substituted for the appellants' 5th prayer, all of them submit specific propositions for the guidance of the jury, in passing upon the question of the testamentary capacity of the testatrix, when the wills of 1845 and 1848 were respectively executed. The instruction given in lieu of the appellees' 7th and the appellants' 5th prayer, relate to, and determine the operation and effect of the execution and subsequent loss or destruction of the will of 1847, upon the will of 1845, and upon the rights of the appellees as heirs at law of the testatrix; and that given in lieu of the appellants' 6th prayer, simply pronounced the legal effect of the probate of the will of 1848, as to real estate, and imposed upon the appellees the burden of showing that, in reference to real estate, that paper was not the last will of the testatrix. The 11th prayer of the appellees, relates only to the title of one of the lots claimed by them in this case. With this general statement of the character and purpose of the prayers and instructions presented for re-

view by the 2nd exception, we proceed to consider the question as to the admissibility of the evidence, to which the 1st exception was taken.

The offer of the appellees was, to prove by St. George W. Teackle, that his brother Dr. Teackle, one of the witnesses to the will of 1848, called at his office on the afternoon of the day when that will was executed, and said to him that "Miss Rachel had executed a will, and that she was not fit and was crazy, or some expression to that effect;" to which the witness replied, that he hoped he, the doctor, did not witness it, in answer to which the doctor said, he had, but was only attesting her signature, and further added, that he had said the same thing to Dr. Johns, another of the attesting witnesses, who replied, that she was competent, although he had observed her incoherency. This evidence was objected to on the ground that it was hearsay, and the question is, whether it, or any part of it, falls within any of the established exceptions to the general rule by which such testimony is excluded. The case of *Townshend vs. Townshend*, 9 *Gill*, 505, was relied on as an authority for the admission of the evidence under consideration. The question there arose, upon the trial of issues as to the validity of a will propounded for probate, and the offer was to prove certain declarations as to the condition of the testator, made to the witness under examination, by one of the deceased witnesses to the will, for the purpose of rebutting the *prima facie* effect of his attestation, which evidence was held admissible. The difference in fact between that case and the one before us is this: There, the evidence objected to was admitted upon the trial of issues contesting the validity of a will before probate, and in this, it was offered to impeach a will after it had gone to probate, and thereby become conclusive as to personalty, and presumptively valid as to real estate. In disposing of the question presented, we have therefore to inquire, whether the variance shown, is of such a character as to justify the adoption of a different rule from that established by

the decision in *Townshend's Case.* Limiting our attention exclusively to that portion of the evidence showing the declarations of Dr. Teackle alone, we think it does not. The Act of 1831, ch. 315, provides, that the probate of a will disposing of real estate, shall be taken only as *prima facie* evidence of such will, and it was held in 14 *Md. Rep.*, 532, on the previous appeal in this case, that the intent and effect of that provision was, to throw the burden of proof on those who might make claim to land adverse to title under a will admitted to probate, whether the probate be had in common form or in the more solemn form of a plenary proceeding. The probate of a will, is simply proof of it by the proper tribunal, and as probate, under the provisions of the Act, has no other effect than to raise the presumption of validity, there is no reason why it may not be assailed, as well by testimony which impairs or destroys the effect of such probative facts as the law requires to be established in all cases before the probate is allowed, as by proof entirely disconnected from and independent of those facts. The offer of the probate necessarily brings forward such facts as the law requires should be shown in the proof of all wills disposing of real estate, and it cannot be said that any of the evidence thus made necessary by law to the proof of a will, whether it be of fact or rest in presumption, is screened from assault by those against whom the probate is offered, for in contemplation of law, all such facts and presumptions are presented as fixed legal elements of the probate itself. The probate of such a will, as it does no more than shift the burden of proof by raising a presumption of validity, like any other evidence producing a like effect, may be impeached by any proof that contradicts or impairs the force of that, which by statutory provisions or rules of law, must have been offered before the probate was had. In this case Dr. Teackle was the last in order of the three persons who witnessed the execution of the will offered in evidence with the probate, and it is clear that the probate could not have even the effect pre-

scribed by the Act without some presumption from his attestation in favor of the will. We hold therefore that the offer of the probate of necessity brought forward, with the other evidence upon which it was had, the presumption resulting from his attestation, and that the presumption thus presented, was as much open to contradiction or qualification by proof of such of his declarations as were inconsistent with it, as it was in *Townshend's Case* upon the trial of issues before the probate. In our view of the question, the principle upon which the evidence in that case was excepted from the operation of the general rule excluding hearsay testimony, applies with equal propriety and force in this, and we think, therefore, that there was no error in admitting the evidence of Dr. Teackle's declarations for the purpose of rebutting the *prima facie* effect of his attestation. In regard to that portion of the evidence, showing the conversation between Dr. Teackle and Dr. Johns, the question is different, but conceding that it was inadmissible, we cannot reverse on the exception as it stands, for according to our settled practice, the appellant loses the advantage of his objection, if any part of the evidence covered by the exception, was admissible. *Budd vs. Brooke,* 3 *Gill,* 220. *Waters vs. Dashiell,* 3 *Md. Rep.,* 455.

In proceeding to the consideration of the several questions presented by the 2nd exception, it may be remarked, that evidence was offered without objection, from which all the hypothetical facts of the prayers and instructions rejected and granted, might be found, and that none of the prayers rejected or granted, nor of the instructions given in lieu of the rejected prayers, are open to objection on account of the assumption of any fact.

The 5th instruction of the Court given in lieu of the appellees' 6th prayer, and the appellants' 3rd and 5th prayers rejected, with the instruction substituted therefor, submit propositions for the government of the jury in finding the measure of testamentary capacity required for the making of a valid will. The appellant admits that the instruc-

tion substituted for his prayers, was unobjectionable, but he contends, that the instruction given in place of the appellees' 6th prayer, is erroneous, because the statement of what constitutes a sufficient testamentary capacity in the terms of the Act of 1798, ch. 101, sub-ch. 1, sec. 3, is followed by an explanation of their legal meaning and effect. We think there is no real foundation for this objection. The explanation of the statutory clause, *"of sound and disposing mind and capable of making a valid deed or contract,"* is entirely consistent with the clause itself, and so clear and explicit that it could not have confused or mislead the jury. The Court of Appeals in *Davis vs. Calvert 5 Gill,* 269, used the same language in declaring the import and force of the clause in question, and as it does not vary nor qualify the statutory measure in any degree, we can see no impropriety in submitting the words of the statute to the jury in connection with the explanation objected to. We are of opinion that the rule for ascertaining the degree of capacity required for the making of a valid will, was properly prescribed by this instruction, and that there was no error in substituting it for the rejected prayers.

The appellees' 3rd, 4th, 5th, 9th and 10th prayers, directed the jury that it was their province to decide upon the testamentary capacity of the testatrix, and in doing so, that certain facts, hypothetically presented in the prayers, should, if found, be considered evidence in connection with the other circumstances in the case. The appellant, without denying that there was evidence of these facts, nevertheless insisted that all of these prayers were improperly granted. The most, if not all of them, were opposed on the general ground, that the hypothetical manner of presenting the facts, pronounced to be evidence, imported a degree of importance not properly attributable to them that tended to mislead the jury. The obvious purpose of these prayers was to remove all doubt from the minds of the jury as to the propriety of considering the facts thus presented in the connection proposed, and they certainly go

no further than was necessary to insure that result. In effect, they simply enunciate the proposition, that certain facts which the jury might otherwise have disregarded, constituted evidence on the question of testamentary capacity, and if there was no error in thus declaring those facts to be evidence, the right of the appellees to these instructions could not be questioned. But the 9th and 10th prayers were objected to on the more material ground, that the influence of the appellant upon the testatrix, as also her declarations in the conversation with Mr. Teackle, were not evidence which the jury could take into consideration in finding her condition when she executed the disputed wills. The question whether she was competent to make valid testamentary dispositions of her property when the wills of 1845 and 1848 were made, necessarily involved a consideration of the circumstances and influences which surrounded and operated on her mind, as well as of those which tended more directly to show its healthy or diseased condition, for its real state could be made to appear only by proof of its manifestations as related to the influences or circumstances inducing it to act, and by the sufficiency and reasonableness of which, its soundness could be tested. For the purpose of showing what her mental condition was, when the wills in question were executed, any evidence of the circumstances and nature of its action, both before and after those periods, was admissible. *Davis vs. Calvert,* 5 *Gill,* 269. The 9th prayer did not contemplate the impeachment of the wills on the ground of undue influence, but the single proposition, that the influence of the appellant was a fact, that bore relation to, and attended their execution, which the jury might consider in passing on the testamentary capacity of the testatrix, and it is not material within the purview of the prayer, to consider whether the influence of the appellant was such as the law permits or prohibits, for the point decided was altogether independent of those considerations.

The declarations of the testatrix, narrated in the 10th

prayer, were also properly submitted to the jury under the rule stated in *Davis & Calvert*, for the state of her mind at that time, as related to its condition when the wills were made, was undoubtedly a matter for their consideration. It is true that, in form, the prayer presents a somewhat different proposition, but to us, the reason for any distinguishment in principle is not so obvious. Whatever appreciable force these declarations might have had upon the question of mental soundness when they were made, it is clear that in and through that connection, they were, with the other circumstances in the case, evidence which the jury might consider in finding the condition of the testatrix, when she executed the will of 1848. Being thus before the jury on the question of testamentary capacity at that time, it is difficult to perceive, upon the hypothesis of the prayer, that she was sane and intended to speak the truth when making those declarations, why the direct and consistent inference authorised by the prayer should not be permitted. Under no circumstances could the declarations operate as a revocation of the will of 1848, nor could any objection be made to them in the connection proposed by the prayer on that ground, for, as presented, they go to the question of the validity of the will and not to that of its revocation. We think the appellees' 3rd, 4th, 5th, 9th and 10th prayers were properly granted. The 1st, 2nd, 3rd and 4th instructions given by the Court in lieu of the appellees' 1st, 2nd and 6th prayers rejected, we find also free from objection. Although covered by the 2nd exception, they were not opposed in the argument of the case, on the ground of any material error.

The most important questions in the case, are raised upon the instructions given by the Court in lieu of the appellees' 7th prayer, and the 3rd and 4th of the appellant. These instructions substantially propound the following propositions: 1st. That if the will of 1847, contained a revoking clause, and was intended by the testatrix to revoke her previous wills, then the will of 1845 did not bar the

appellees' right to recover, unless it appeared that she destroyed the former will with the intention of reviving the latter; and 2nd, that if she destroyed the will of 1847, when of sound mind, then its destruction was *prima facie* evidence of an intention to revive the will of 1845, but if it was destroyed without her knowledge, or by her when insane, then an intention to revive the will of 1845 could not be presumed.

Our duty in reviewing these instructions, is first to ascertain whether the revoking clause of the will of 1847, was ambulatory and revocable with the will, or a provision that took effect independently of the will, and if the latter, then to determine upon the hypothesis stated, the legal effect of destroying the will of 1847 upon the will of 1845. The authorities on the first of these questions, undoubtedly establish the principle that an unconditional revocation is not essentially testamentary in its nature, and, like the will containing it, liable to vary with the testamentary purpose, but a positive consummated act, producing an immediate and conclusive effect. It is true that where the revocation of a previous will is implied from the inconsistent testamentary provisions of one subsequently executed, the question may be a different one, for in such a case, the revocation of the first will depends upon the testamentary purposes expressed in the last, which of necessity continue to be ambulatory and revocable during the life of the testator. The case of *Goodright vs. Glaizer*, 4 *Burr.*, 2512, is an illustration of this principle. But a clause in a subsequent will, which in terms revokes a previous will, is not only an expression of the purpose to revoke the previous will, but an actual consummation of it, and the revocation is complete and conclusive, without regard to the testamentary provisions of the will containing it. *Burtenshaw vs. Gilbert, Cowp.*, 49. *James vs. Marvin*, 3 *Conn.*, 576. *Boudinot vs. Bradford*, 2 *Dall*, 266. *Walton vs. Walton*, 7 *Johns. Ch. R.*, 258. *Pow. on Dev.*, 528. *Brown vs. Brown*, 92 *Eng. C. L. R.*, 875. These cases also, with the exception of the last, which was decided after the statute 1 *Vict., ch.*

26, go to establish the rule that a will, thus expressly re-voked, cannot again be revived, except by republication or some other formal testamentary act directly affirming it; but on this point there is much conflict of authority.

In *Harwood vs. Goodright, Cowp.*, 87, and *Goodright vs. Glaizer*, 4 *Burr.*, 2512, Lord Mansfield held, that cancel-ling a revoking will operated to revive the will revoked, and Mr. Jarman, on the strength of these cases, maintains the same doctrine. There is no doubt a sufficient reason for the adoption of this rule, when the revocation of a pre-vious will results by implication from the inconsistent tes-tamentary provisions of one subsequently executed, for as before observed, the revocation in such a case is ambula-tory and without effect during the life of the testator; or, stating it more accurately, the revocation of the previous will could not even be implied until the will upon which the implication might arise becomes an effective testamen-tary act. But it is evident that the rule thus generally stated might often operate in derogation of the real testa-mentary purpose, and if asserted as an established princi-ple of law, it would not be difficult to imagine cases where its application would at least be questionable, if not productive of hardship and injustice. But whatever effect the real principle involved in the cases cited might have, in limiting or qualifying the rule stated by Mr. Jarman, a different doctrine prevails in the Ecclesiastical Courts of England, whose decisions have long been recognized in this State as authority upon controverted questions of testa-mentary law. The principle established by the cases there adjudicated is, that the cancelling of a will containing an express revocation of a previous will does not necessarily revive the will revoked, although the presumption of an intention on the part of the testator to revive the previous will may be raised by his destruction of the revoking will. In the case of *Helyar vs. Helyar*, 5 *Eccl. R.*, 416, it was held, that a will, subsequently revoked by another will, could not be revived without "republication or some

express declaration of the testator that he would have the first operate as his will," and in the case of *Moore vs. Moore,* 1 *Eccl.*, 123, decided in the High Court of Delegates in 1817, Park and Abbott, both distinguished jurists then sitting, it was held, that the cancellation of a subsequent will by mutilation, did not revive a previous will of nearly the same import. In *Usticke vs. Bowden,* 2 *Eccl. R.*, 244, Sir John Nicholl in delivering his opinion said, that the true principle to be extracted from the judgment of the Court in the case of *Moore vs. Moore,* was, that the legal presumption from the cancellation of a revocatory will, is neither adverse to, nor in favor of, the revival of the previous will. The same doctrine as to the presumption from the cancelling of a revoking will was adopted in the subsequent cases of *Major vs. Wilson,* 7 *Eccl. R.*, 453, and *James vs. Cohen, Ib.*, 585. The question, as to the revival of a previous will, thus appears to be reduced to one of fact dependent on all the evidence going to show the testator's intention, and not one of legal presumption. That the cancellation of a revoking will, *prima facie,* is evidence of intention to revive the previous will, is true, but it is obvious that the presumption of that intention from the mere act of cancellation may be strengthened, qualified or rebutted altogether, by evidence of the attending circumstances and probable motives of the testator. *Lawson vs. Morrison,* 2 *Dall.*, 286. *Boudinot vs. Bradford, Ib.*, 265. In the absence of such evidence, the proposition, that the act of cancellation alone is evidence of intention to revive the previous will, would certainly seem to be free from objection. We conclude, therefore, that the destruction of the will of 1847, did not revive the will of 1845, unless it was further found that the testatrix so intended, and that the destruction of the will of 1847, if done by her when sane, was *prima facie* evidence of that intention.

The objection that the appellees were not entitled to set up the will of 1847, as a revocation of the will of 1845, because its contents were not proved with sufficient cer-

50      v. 20.

tainty to have effect as a devising will, in our opinion cannot be sustained. In a case where the revocation of a will results by implication from the testamentary provisions of a subsequent will, the objection stated might be fatal, but these instructions do not proceed on that hypothesis of fact, but on the assumption that the will of 1847, containing an express revocation of the will of 1845, was cancelled or destroyed. Even disregarding the legal consequences of the destruction of this will, it is settled that a will, valid in all its essential parts, but inoperative from other circumstances, may, nevertheless, have the effect of revoking a previous will. *Roper vs. Radcliff,* 10 *Mod.,* 233. *Beard vs. Beard,* 3 *Atk.,* 72. But upon the theory of these instructions, this will, containing a clause by which the will of 1845 had been expressly revoked, was destroyed and rendered wholly inoperative as a devising will, and whether the independent effect of the revoking clause, or the inoperative character of the will be considered, it clearly follows, that the objection stated cannot be maintained. · The authorities relied on by the appellant, are not directly applicable to the question, for they are, most of them, cases in which the revocation of the previous wills was so connected with, and dependent on accompanying testamentary provisions, as to be held conditional and not absolutely effective. The assumption of the alternate proposition, that the will of 1847 was not destroyed by the testatrix, would afford no stronger ground for the appellant to insist upon that will as a bar to the appellees' right to recover, for the evidence of its testamentary provisions was not of that clear and positive character required to give effect to the instrument as a devising will; and under those circumstances the Court could not have left that fact to the jury, nor instructed them that, if found, it would bar the claims of the appellees. *Jarman,* 223. *Davis vs. Sigourney,* 8 *Met.,* 487. *Rhodes vs. Vinson,* 9 *Gill,* 169.

The remaining question raised on the appellees' 11th prayer, whether the part of Lot No. 13, fronting nineteen

feet on the south side of Baltimore street and extending back thirty-six feet on South street, should be considered real and not leasehold property, is simply one as to the legal presumption from the statement of admitted facts, upon which that prayer was predicated. It appears from this statement of facts, that the whole of Lot No. 13, was leased with a covenant for perpetual renewals in 1777, by Nicholas Rogers to Jacob Welsh, and that the portion in question, by a course of regular assignments, came into the ownership and possession of Patrick Colvin, father of the testatrix, subject to one-half of the rent reserved on the whole lot by the original lease. It also appears that the testatrix, as only surviving child and legal representative of her father, having become entitled to, and taken possession of this property at his decease, afterwards, in 1823, purchased the reversion from Lloyd N. Rogers, the sole heir at law of Nicholas, and ceased to pay the rent reserved from that time, but the written paper purporting to be a deed and duly recorded as such, by which the conveyance of the reversion to the testatrix was sought to be made, was not sealed by the grantor.

The appellant claiming this property as leasehold under the will of 1848, which by probate had become conclusive as to personal estate, objected to this prayer on the ground that these facts were sufficient to explain the possession of the testatrix, and bar the legal presumption of a grant in fee.

The presumption of title from possession arises only when the possession proved, appears to have been perfectly consistent with an unqualified ownership, for the consistency of the possession with such an ownership, constitutes the evidential fact from which the law infers that it originated in grant. The correlative proposition, that a grant will not be presumed when the possession is explained by evidence showing that it was taken in virtue of some qualified interest or estate, less than that of an absolute title, is equally well founded, for the legal presumption in that case is, that the possession

was continued in virtue of the qualified estate, and not adversely to the outstanding superior title. It was said in the case of *Gwynn vs. Jones*, 2 *G. & J.*, 173, that the mere holding over after the end of a term, was not evidence of adverse possession, and that the person so holding over would be regarded as a tenant at will, unless he could show that he had held forcibly, or had acquired a title paramount to that under which the possession was originally taken. When one holding the equitable title of an estate, has such a beneficial occupation of it as to give reason to suppose the legal title has been conveyed to him, a jury may be advised to presume such a conveyance, but it is unquestionably settled, that there can be no such presumption, if it appears in a special verdict or case stated that the legal title is still outstanding. *Reede vs. Reede*, 8 *Term Rep.*, 122. *Matthews vs. Ward*, 10 *G. & J.*, 443. The same principle was asserted in *Owings vs. Norwood*, 2 *H. & J.*, 96, where it was held that there could be no presumption that the title was perfected by grant, where it appeared that a deed was actually made but defectively executed. In this case the testatrix entered into the possession of the property in question under a leasehold title, and although she afterwards became the purchaser of the reversion from Rogers, she appears not to have obtained an actual conveyance of it by a valid deed. On the contrary, the instrument that was intended to effect the transfer was wholly inoperative for that purpose, and whatever effect it had in establishing an equitable claim to the property, it clearly shows the legal title to be still outsanding. We must therefore assume, on the authority of the cases cited, that the possession of the testatrix was maintained, as it was taken, under her leasehold title, and that it was not adverse to the outstanding legal title to the reversion. It follows, as a matter of course, that the property could not be regarded as real estate, within the purview of this case.

In accordance with the views expressed, we affirm the

ruling of the Court in the 1st exception, and also those in the 2nd, with the exception of that upon the appellees' 11th prayer, but as we think there was error in granting that prayer, we shall reverse the judgment and direct a judgment to be entered for the lessor of the appellees, for the parcels of ground, as described in the paper filed by agreement in this case, as a statement of their claims and pretentions, excepting therefrom the parcel located at the corner of Baltimore and South streets, designated therein as part of Lot No. 13.

*Judgment reversed.*

(Decided Dec. 11th, 1863.)