Argued February 19, affirmed March 5, 1918.

# MELHASE *v.* MELHASE, EXECUTOR.

(171 Pac. 216.)

**Wills—Setting Aside Probate—Issues and Proof.**

1. In a proceeding to set aside the probate of a will, a petition, alleging that the instrument admitted to probate was not the last will and testament of the decedent, was sufficient to permit the admission of evidence of the existence of a later will revoking the one admitted to probate.

**Wills—Lost Wills—Parol Evidence.**

2. In a proceeding to set aside the probate of a will, evidence of the execution and contents of a later lost will, so far as they could be reproduced from the memory of witnesses cognizant of the circumstances, was admissible to show that it superseded and revoked the will admitted to probate; there being no attempt to probate the lost will.

**Wills—Revocation by Subsequent Lost Will—Sufficiency of Evidence.**

3. In a proceeding to set aside the probate of a will, evidence *held* sufficient to show that the testator made a later will revoking the one probated, which was lost or suppressed.

**Wills—Revocation by Subsequent Lost Will—Sufficiency of Evidence.**

4. In a proceeding to set aside the probate of a will, it was not necessary for the petitioner to prove the whole substance of a later lost will, and it was sufficient that she clearly established the fact that a later will was made, and that it revoked prior wills.

[As to the necessity that the contents of a subsequent will be proved in order that it may revoke prior will, see note in Ann. Cas. 1914D, 130.]

From Klamath: DELMON V. KUYKENDALL, Judge.

A proceeding by Henrietta F. Melhase against Gustav Melhase, executor of the estate of Frederick Melhase, deceased, Bertha Lehenbower, Clars Frank, Emma Ketsdever, Alford Melhase, Richard Melhase and Gustav Melhase, to set aside the probate of and to cancel a will made by Frederick Melhase. There was a decree for the plaintiff and defendants appeal. Affirmed.

Department 2.    Statement by. MR. CHIEF JUSTICE
McBRIDE.

This is a proceeding to set aside the probate of a
will.    The petition alleges in substance that;Frederick
Melhase died December 8, 1915, being at the time a
resident of Klamath County, Oregon; that on Decem-
ber 16, 1915, Gustav Melhase presented to the County
Court;an instrument purporting to be the last will and
testament of said decedent and filed a petition for its
admission to probate, and the appointment of himself
as executor, which petition was granted.    Then suc-
ceed the following allegations:

"That the said Frederick Melhase never signed the
said purported and alleged instrument in the presence
of the witnesses whose signatures appear upon same;
that the said witnesses never signed the said instru-
ment at the request of the said  Frederick Melhase,
and that the said Frederick Melhase never, at  any
time, published the said instrument and declared the
same to be his last will and testament, and therefore,
plaintiff alleges that the said purported and  alleged
instrument never was the will and testament of the
said Frederick Melhase.

"That the defendants, and all of them, well knew at
the time of the offering of said instrument as the last
will and testament of the said Frederick Melhase that
the said instrument was not the last will and testament
of Frederick Melhase, deceased.

"That the said instrument offered and admitted to
probate is not the last will and testament of the said
Frederick Melhase, deceased.

"That the said  defendants, acting  together, have
conspired to suppress and have suppressed the true
will and testament of the said  Frederick  Melhase
deceased, to the damage of this plaintiff."

The defendants answered, admitting generally the
probating of the alleged will of 1908 and denying the
paragraphs above quoted.    A trial was had before the

County Court sitting in probate, which found in favor of the respondent and dismissed the petition. Thereupon petitioner appealed to the Circuit Court, which found for the petitioner and reversed the decree of the County Court and revoked and annulled the letters testamentary issued to defendant Gustave Melhase. From this decree defendants appeal.     AFFIRMED.

For appellants there was a brief over the names of *Mr. C. F. Stone* and *Messrs. Snow, Bronaugh & Thompson,* with oral arguments by *Mr. Stone* and *Mr. W. Lair Thompson.*

For respondent there was a brief over the names of *Mr. Charles J. Ferguson, Mr. Thomas Drake* and *Messrs. Emmons & Webster,* with oral arguments by *Mr. Lionel R. Webster* and *Mr. Ferguson.*

Opinion by MR. CHIEF JUSTICE McBRIDE.

A preliminary question is raised by respondent as to the validity of the execution of the will presented to the County Court by defendant Gustav Melhase, but it is sufficient to say that we are of the opinion that it was properly attested and entitled to probate unless it had been revoked by a subsequent will. We take it therefore as established that on the twenty-eighth day of July, 1908, deceased duly executed a valid will by which he devised certain property and bestowed legacies upon plaintiff and the defendants, and unless there was a later will revoking that of July 28, 1908, petitioner's contest must fail. Having established the will of 1908 as a will valid in form and substance the proponent was not obliged to negative by testimony the existence of a possible subsequent will, and it devolved upon the petitioner to show by testimony of the same character as that required of the proponent in the first

instance, that deceased executed a later will which, by its actual language or by necessary implication, revoked the will presented by proponent.

1, 2. It is claimed by appellants that the petition does not state facts sufficient to permit the admission of evidence of the existence of a later will, but we think the allegation that the instrument propounded is "not the last will and testament" of deceased, is broad enough to justify the admission of any testimony which might tend to show a state of facts inconsistent with the continued validity of the instrument. The contention of the petitioner is that in 1911 the deceased made a valid will revoking the will of 1908, which will has been lost, suppressed and destroyed, and all of the contents of which cannot be reproduced by oral testimony. There is no attempt here to probate this alleged lost will. Evidence of its execution is only admitted for the purpose of showing that it superseded and revoked the will of 1908, for which purpose we think evidence of its execution and contents so far as they could be reproduced from the memory of witnesses cognizant of the circumstances, was admissible.

3. We will now consider the testimony regarding the execution of the alleged will of 1911. It was not produced. If it actually existed it was lost or suppressed. The evidence that it was suppressed by the proponent is not conclusive. Shortly after the death of his brother, he procured from the petitioner the keys to the safety deposit box of deceased, which he claims to have been a partnership box of himself and deceased, but to which he had no key and no access during his brother's absence, and in company with his near relatives made a search for a will and produced the will of 1908. It is a suspicious circumstance that this search was made without notice to the wife of de-

87 Or.—38

ceased, who was certainly the person most interested in the result, and only in the presence of the immediate relatives of proponent. It also appears that proponent is claiming an oral partnership with deceased, and that his interests in that respect would be antagonistic to petitioner. His conduct in instituting this secret examination is at least open to suspicion, which his testimony does not dispel. The opportunity to examine and suppress a later will existed, there was a possible motive, and the secret method adopted does not commend itself. The evidence of Mr. Stone, who is one of the attorneys for proponent is significant. He testified in substance, that when the 1908 will was brought to his office he told proponent to go back and take another look, and further testified as follows:

"Q. I think you have stated that you told the witness, Gustav Melhase, when he brought that will and this envelope together, as you say this paper here, this purported will and another envelope,—you told him to go back and take another look?

"A. Yes, I did.

"Q. You had a reason for telling him that?

"A. Yes.

"Q. What was the reason? Can you tell us now, Mr. Stone?

"A. Well, I had an impression we had made Fred Melhase's will.

"Q. Well, now,—

"A. That recalled the impression to my mind.

"Q. You didn't make this? [Referring to Exhibit 'A.']

"A. No, I didn't make that; that is not my work on the typewriter, or the work of anybody that ever worked for me on the typewriter. No, I never made that will. * *

"Q. In your opinion, when did you make a will for Fred Melhase, about when?

"A. Well, according to the impression that is in my mind I think I made a will for Fred Melhase sometime in the early part of 1911.

"Q. That would be some three years later?

"A. Yes, in 1911.

"Q. The will was executed, I suppose? If you made a will for him, it was executed?

"A. Well, I don't remember its execution as an independent fact. I don't believe I remember the execution of any instrument that was ever made in my office unless it was made a few days ago, as an independent fact, that is, each person signing. Now, to illustrate, I think I made a will for Mrs. Melhase.

"Q. About when?

"A. About the early part of 1911.

"Q. Right at the same time you made the will for Fred Melhase?

"A. About the same time, but I don't remember. I don't remember seeing her sign that will. There are some people probably who remember those things. I can't unless I try to store my memory with them and that would be useless; if one did that, they would be so confused, they could not testify to anything. * *

"Q. Now in the will that you made, have you any recollection what it purported to give, devise, and who the legatees and devisees were? Do you remember any of them?

"A. Well, now there is something in my mind in a rather indistinct way; it is no stronger than what I said with reference to my memory of having made his will.

"Q. You have noticed the contents of this have you not, this Exhibit 'A' here?

"A. Yes, I am familiar with the contents of that.

"Q. You have noticed a devise in here to Mrs. Henrietta F. Melhase, the widow?

"A. Yes.

"Q. Do you remember whether she was mentioned in the will that you made for Fred Melhase?

"A. My recollection is that she was.

"Q. Do you remember of a person mentioned in the will that you made, getting a legacy, a little child, a little girl of Fred Shallock, of this city?

"A. Yes, I,—that, in fact, is the thing that fixes the making of the will on my mind, or that fixes in my memory there was a legacy, or I am of the opinion, to the best of my—

"Q. Has it come back to you?

"A. There was a legacy left to the little girl of Fred Shallock.

"Q. Little Constance Shallock?

"A. I don't know what her name is; her mother is sitting here, Mrs. Fred Shallock.

"Q. Mrs. Fred Shallock's little daughter?

"A. Yes.

"Q. I will ask you to state whether or not you were legal adviser for the deceased, Frederick Melhase, for some time prior to his death?

"A. I was for a number of years.

"Q. I will ask you to state with reference to that little girl whether or not you have heard the deceased, when addressing himself with reference to her use any pet name? Did you ever hear him call her 'that little devil' for instance, meaning it in an endearing way?

"A. Yes, I have heard Fred Melhase talk about the little girl frequently; I have heard him talk in my office; I have heard him speak of her; he thought a great deal of the little girl. I have, yes. I have often seen him on the street with her.

"Q. She called him grand dad?

"A. I think he thought quite a lot of the little girl and she seemed to think a great deal of him.

"Q. Now, do you have any recollection of about the amount of legacy to that little girl?

"A. Somehow or another I have it in my mind that it was $1,500, that is the way I recollect it.

"Q. I will ask you to state whether or not you are acquainted with Mrs. Fredericka Melhase, the mother of Frederick Melhase, deceased. Were you acquainted with her in her lifetime?

"A. No."

The witness further testified:

"A. Let me tell you the frame of my mind. If you were to present me with a will witnessed by myself and J. J. Barrett, and signed by Frederick Melhase, I would not hesitate a minute, if it was made about that time, to state that I made that will, and to say that was my signature, if it was my signature, but as I told you, I don't remember seeing Fred Melhase sign that will and I don't remember seeing J. J. Barrett sign as a witness. I don't remember signing myself. I told you what I do remember according to the way I recollect it. I remember drawing a will for Fred Melhase, remember of Barrett sitting at the typewriter in the other office and writing on that will. Now, that is just about all I recollect, so far as the making of the will is concerned. I have got that fixed in my memory as something, some way or another, that got into my memory, and it is there, and I recalled it at the time this will was brought into my office, when we took it out of these envelopes. I recollected that and I thought that probably there might be another will. I was under that impression. Of course, after a man dies and you made his will, it comes into your mind some way or other.

"Q. Certainly.

"A. I was under the impression when the will was brought in, it would be the one I made.

"Q. Naturally.

"A. That is about the way the thing was fixed in my mind. As I told you, I don't understand the memory of a man who can go on the stand and say he can remember signing, or anything like that, so many years afterwards. I cannot do it."

Mr. Stone was not volunteering any testimony against his client, but nobody can read the record of it as a whole without being satisfied that his memory convinces him that in 1911 he made a will for the deceased, and that the details of the transaction only are uncertain, as they well might be after a lapse of so many years. Mr. Stone's partner at the time the

alleged will was executed, was J. J. Barrett, a young man just entering upon the practice of law, who testified that in the first half of January, 1911, the deceased came to the law office of Stone and Barrett and had a talk with Mr. Stone; that as a result of that interview, Mr. Stone drew up in pencil the draft of a will for deceased and handed it to him to copy upon the typewriter, which he did; that it was the first will he ever had anything to do with drafting; that he was not very familiar with the form of wills at that time and kept a copy which he used thereafter as a form in drafting other wills; that the will was in the ordinary form used here in Oregon; that he remembered the names of the persons mentioned as legatees and devisees; that Gus Melhase and Fred Shallock were named as executors; that he could not recollect the amounts of the various bequests and legacies, but was positive that Fred Shallock's daughter was to receive $1,500. He remembered that the wife of deceased was mentioned in the will and also his mother, three brothers and two sisters; that witness and Mr. C. F. Stone subscribed their names as witnesses. In answer to leading questions Mr. Barrett testified that the will contained the usual clause revoking all prior wills and codicils.

Unless this witness has committed downright perjury, the deceased in January, 1911, executed a will revoking all other wills. It is easy to forget an actual occurrence, but it is not within the bounds of ordinary experince that one honestly thinks he remembers the details of an occurrence which happened only in his imagination. This testimony is either fabricated out of whole cloth or it is true. We believe it to be true, because it is corroborated by the imperfect recollection of Mr. Stone and the additional circumstances

hereafter referred to. Mr. Stone testifies that the one thing that recalls indistinctly to his memory the fact that he made a will for deceased, was the fact of a legacy given by it to little Constance Shallock, the daughter of Fred Shallock. It is in evidence that he was greatly attached to the child and referred in a rough yet endearing way to her as his "little devil" and his little partner. The child is not mentioned in the will of 1908.

F. C. Stitser, a friend of deceased, visited him in San Francisco during his last illness, and in the course of a conversation with him not necessary to detail here, said—referring to Constance Shallock— "I suppose your little partner is remembered in your will," to which he says that deceased replied, "Yes, that little devil will be remembered," or "has been" or words to that effect. Barrett testifies that the fact that this little girl (who was seven years old and no relation to deceased) was remembered in the will made a distinct impression on his mind and, as already remarked, this circumstance seems to have created a distinct impression on the mind of Judge Stone. Mrs. Melhase (wife of deceased) testified that in 1915, deceased had his bank boxes at home examining his papers and she said to him referring to one of the boxes, "Does that amount to all your worldly affairs?" and he answered "It probably does," and said, motioning to one of the boxes, "My will is in there." She then asked, "Who made your will?" and he answered "Stone made my will." Stone testifies that he never drew the 1908 will. An old friend of deceased, Mr. W. T. Lee, visited him at San Francisco during his last illness, and in the course of a discussion about his health and in relation to a contemplated

operation, he remarked that he "had things fixed."
The testimony of this witness continues as follows:

"Q. Did he explain to you what he meant by having
things fixed?

"A. Well, he said he had his will made. I said that
it made no difference about a will, that what I was
trying to get from him was a promise that he wouldn't
let them cut him up; that the will proposition would
be after he was gone. He says, 'Yes, that is true but
I have made up my mind to go and have this done
and I am going to do it.'

"Q. Did he refer to the will again?

"A. He said his will, and I asked him, 'Who does
your work for you, Fred, along that line?' 'Why,' he
says, 'Stone.' I don't know whether he said Stone
and Gale or just Charley Stone. He said, 'Charley
Stone has been my attorney for a long time.'

"Q. Do you mean to be understood that he told you
that C. F. Stone, lawyer, made his will?

"A. Well, I mean to be understood that he left the
impression with me that Stone was the man that was
connected with that proposition. I wouldn't say that
he told me that Charley Stone made his will, but I will
say that he gave me to understand that Charley Stone
had attended to his business and that he had fixed the
proposition all up.

"Q. Did he tell you where his will was at that time?

"A. He said it was in Seimen's Bank."

From all these circumstances we are irresistibly
drawn to the conclusion that Mr. Stone's impression
and Mr. Barrett's absolute statement that Mr. Stone
drew up a will for deceased in January, 1911, are cor-
rect. We have Mr. Barrett's direct testimony that it
was in the usual form of wills, and that he kept a copy
as a guide in making other wills. It is objected that
this was in answer to leading questions, but no objec-
tions were made to the questions upon this or any
other ground, and when a lawyer says that a will

was in the usual form every other lawyer and every Judge knows what he means, and the same may be said of Barrett's testimony, that the will of 1911 contained the usual clause revoking all other wills and codicils. If we assume that a will was made, and we think that fact was clearly established, it would seem natural that a lawyer of Judge Stone's wide experience and knowledge would have attached to it a revocation clause. A mere tyro at the law might omit it, but Judge Stone never would, and from his very familiarity with that kind of business he would not remember such a detail while a beginner like Mr. Barrett copying his first will would be more likely to remember every little thing connected with its proper execution.

A plausible argument is drawn by defendant from the fact that no charge for drawing the will of Fred Melhase is found upon the books of the firm of Stone and Barrett, although they disclose the fact that charges for less important services were frequently made. The circumstance is not without weight, but in the face of the other circumstances above mentioned and the direct testimony as to the occurrence it is not compelling. Nine years have passed since the alleged will was written, and there may have been a reason existing at the time but now forgotten why no charge was ever made, or if made not entered.

4. It was not necessary in this case that the petitioner should reproduce the whole substance of the second will. It is sufficient that she should clearly establish the fact that a second will was made and that it contained a clause revoking prior wills: *In re Cunningham's Will*, 38 Minn. 169 (36 N. W. 269, 8 Am. St. Rep. 650). We are of the opinion that this has been

done in the case at bar and the decree of the Circuit Court is therefore affirmed.        AFFIRMED.

MR. JUSTICE MOORE, MR. JUSTICE HARRIS and MR. JUSTICE BEAN concur.