FRANCIS A. WHITEHILL *vs.* MATHILDA HALBING ET ALS.

Third Judicial District, New Haven, January Term, 1922.
WHEELER, C. J., BEACH, GAGER, CURTIS and BURPEE, Js.

Under § 4946 of the General Statutes, originally enacted in 1821, which
prescribes that no will or codicil shall be revoked except by burning,
cancelling, tearing or obliterating by the testator, "or by a later
will or codicil,"—a will is not revoked by the mere *execution* of a
later will, although the latter does contain a revocatory clause;
for the later will, including the clause of revocation, is itself ambulatory, and if it be destroyed by its maker with knowledge that
the former will is then in existence—as in the present case—
that will, if allowed to stand until the death of the testator, is entitled to probate as his last will and testament. (*One judge dissenting.*)

Argued January 20th—decided August 11th, 1922.

APPEAL from a decree of the Court of Probate for the
district of New Haven approving and admitting to
probate a certain written instrument as the last will
and testament of Barbara Ploeger, late of New Haven,
deceased, taken to the Superior Court in New Haven
County and tried to the jury before *Marvin, J.;* the
jury, as directed by the trial judge, returned a verdict
for the defendants, and from the judgment rendered
thereon the plaintiff appealed. *No error.*

The court directed the verdict upon facts agreed upon
by all parties to the appeal. Among these facts it
appears that on July 31st, 1914, Barbara Ploeger duly
executed her will in duplicate. On April 7th, 1919, she
duly executed another will expressly revoking all
former wills made by her. Of this will two copies were
made, but not executed, and the three papers were
taken into her possession by the testatrix. In September, 1919, and again in February, 1920, she consulted lawyers about drawing a new will and expressed

an intention to do so; but although several different drafts were prepared, she was not willing to execute any of them. She died March 9th, 1920. Afterward both of the executed duplicates of the will of 1914, and also both of the unexecuted copies of the will of 1919, were found among her valuable papers; but no will later than that of 1914 was found. The testatrix had destroyed the will of 1919, knowing at the time that the will of 1914 was still in existence.

Upon the trial the defendants claimed that when the testatrix destroyed this later will, she did so with the intention that the will of 1914 should be her last will, and believed that the will of 1914 was her last will until her death. To prove this claim the defendants offered three witnesses to whom the testatrix had stated during her lifetime that such was her intention and belief. The plaintiff objected to this testimony on the ground that it was immaterial, and the court sustained this objection, and the defendants excepted. Thereupon their bill of exceptions was allowed and made a part of the record for review by this court according to General Statutes, § 5839.

*Charles S. Hamilton,* for the appellant (plaintiff).

*Samuel A. Persky,* with whom was *William J. Kennedy,* for the appellees (defendants).

BURPEE, J. The decisive question raised in this appeal is whether a later will containing a clause expressly revoking all former wills, takes effect immediately and finally, so that after its destruction by the testator a former will existing at the time of his death shall not be approved and set up as his last will. In deciding this question we are governed solely by the statute of wills of this State which was enacted in 1821.

That statute changed the law which had been in force before that time and under which the case of *James* v. *Marvin*, 3 Conn. 576, was reserved for the consideration of this court. It changed "the aspect of the . . . question. It is not now what it was when *James* v. *Marvin* was decided." That case did not answer the precise question before us now. *Peck's Appeal*, 50 Conn. 562, 565. And to this question that case is not applicable. *Security Co.* v. *Snow*, 70 Conn. 288, 294, 39 Atl. 153. We said in *Peck's Appeal*, that before 1821, "any written declaration to that effect revoked a will irrespective of any statute and without regard to the death of the testator. Now the statute requires that the writing, in order to have that effect, must itself be a will or codicil, and executed with all the formalities required for such instruments." That statute, which has not been changed in any respect material to this subject, now reads: "No will or codicil shall be revoked in any other manner except by burning, cancelling, tearing or obliterating it by the testator or by some person in his presence by his direction or by a later will or codicil." General Statutes, § 4946. This statute is "not only directory but prohibitory and exhaustive." *Irwin's Appeal*, 33 Conn. 128, 135. It allows to every person the privilege of individual control over his estate after death only upon certain conditions, and no such power is given to "any person who does not come within and strictly comply with these conditions." *Hatheway* v. *Smith*, 79 Conn. 506, 518, 65 Atl. 1058. The language of this statute is precise and unambiguous. No oral declaration, nor any writing, however framed or executed, whether it be an independent instrument or a clause in a will, can be effective at any time to revoke a will unless it has in itself all the characteristics of a will or codicil. "A will is the legal declaration of intention as to the

disposition of one's property after death. To this intention, made known through the written declaration, the law gives effect, and so executes the testator's will." *Jacobs* v. *Button,* 79 Conn. 360, 362, 65 Atl. 150. The subject-matter of a will is the estate of the person, which can be affected by his intent properly expressed, "only after the death of the testator. The term may be thus defined. A will is the lawful intent of a competent person, legally expressed, regarding his estate, and effective after his death." 1 Alexander's Commentaries on Wills, p. 25. "A will is the expression, in the manner required by law, and operative for no purpose until death, of that which one may lawfully require to be done after his death." Gardner on Wills (2d Ed.) p. 1. Each devise or bequest thus expressed and made known in writing is the "will" of the testator, irrespective and independent of every other provision. *Hatheway* v. *Smith,* 79 Conn. 506, 511, 65 Atl. 1058. So, also, by the explicit terms of the statute, an effective revocatory clause, thus expressed and made known in writing, must be a "will." It is true, as was said in *James* v. *Marvin,* that such a clause "is never a necessary part" of a will. Neither is any other provision a necessary part of a will. Only the formalities prescribed by statute are necessary parts. Any other part may be omitted or may be changed by the testator without affecting another part which the will contains when it is presented for probate; but each of these parts, to be effective, must be a will. None has any vigor of its own. The strength of each is derived solely from the law which executes the legally expressed intention of the testator, but applies its force only after his death. The intention to devise is expressed usually in the present tense, as "I devise." So is the intention to revoke former wills, as "hereby revoking." But no one contends that a clause devising lands takes effect immediately

upon the execution of the will and vests the title then in the devisee. There is no indication of the testator's intention to give, nor any logical reason for giving, to a revocatory clause more immediate force and results than are given to a devising clause. On the contrary, our statute of wills indicates plainly that such instantaneous force and final consequences were not to be given to any revocatory writing by itself. It was said in *James* v. *Marvin*, that at that time in this State "a clause of express revocation" in a will operated the same as "a deed of revocation separate from the will"; that is, instantaneously, of its own force, finally and irrespective of the subsequent destruction of the will. But the legislature did not see fit to include such a separate writing among the exclusive means whereby only a will may be revoked. The manifest inference is that it was not intended to continue to grant the privilege of revoking a will with the effect and consequences which a separate revocatory writing had before the statute was enacted.

By the common law of England before 1837, a revocatory clause in a will perished with the will. The effect of the destruction of a second will containing such a clause "was to revive the first." 1 Jarman on Wills (6th Eng. Ed.) 192; 1 Alexander's Commentaries on Wills, p. 754; Gardner on Wills (2d Ed.) p. 241. In *Goodright* v. *Glazier*, 4 Burr. 2512, Lord Mansfield said, in 1770: "A will is ambulatory till the death of the testator. If the testator lets it stand till he dies, it is his will; if he does not suffer it to do so, it is *not* his will. Here, he had two. He has cancelled the second: it has no effect, no operation; it is as no will at all, being cancelled before his death. But the former, which was never cancelled, stands as his will." And Mr. Justice Yates, concurring for the same reasons, added: "A will has no operation, till the death of the

testator. This second will never operated: it was only intentional. The testator changed his intention; and cancelled it. If by making the second, the testator intended to revoke the former, yet that revocation was itself revocable: and he has revoked it." In 1774 Lord Mansfield declared in *Harwood* v. *Goodright,* 1 Cowper, 87, 92: "Therefore a revocation must be shown and the mode of doing that is by another will. But that is not all; for he [the heir at law] must show in fact, that it was *revoked* by another will which *subsisted* at *the death* of the testator; because if a testator makes one will and does not destroy it, though he makes another at any time virtually or expressly revoking the former; if he afterwards destroy the revocation, the first will is still in force and good." (The italics appear in the report.) This principle was recognized in *Burtenshaw* v. *Gilbert,* 1 Cowper, 49, 52, wherein the same respected authority, less than two months before the decision of *Harwood* v. *Goodright,* said that "a complete, legal, and effectual will" containing a revoking clause, if the testator had "died immediately after," would have revoked an existing former will; but that the cancelling of the later will did not set up a duplicate of a former will which had been cancelled by tearing off the testator's name and seal and cutting off the names of the witnesses. In none of these cases is found authority for the statement that an express revocation is a positive act of the testator, operating instantaneously, by its own force and independently of the consummation of the will in which it is found. On the contrary, the principle declared and applied in each case is that, to effect a revocation by a later will, that will must subsist at the death of the testator.

These decisions authoritatively interpreted and declared the meaning of the words in that section of the English statute of frauds which prescribed the only

means by which wills could be revoked, and which was intended to prevent their revocation except as therein provided.  While this provision was not expressly enacted in Connecticut until 1821, these decisions of the English courts were well known and respected by the lawyers and courts of this State; indeed, they had been regarded as authoritative statements of the common law of England brought to and adopted in this State.  *James* v. *Marvin*, 3 Conn. 576; *Card* v. *Grinman*, 5 Conn. 164, 168.  When the legislature, by the exclusive and prohibitory terms of the Act of 1821, put into statutory form the law of Connecticut relating to the revocation of wills, it abolished by omission the privilege of revoking wills by word of mouth or by any other writing except a will or codicil, but it retained the other provisions of the statute of frauds, and expressed them in the identical words of that statute; namely, that "no devise of real estate shall be revoked otherwise than by burning, cancelling, or obliterating . . . or by some other will or codicil in writing." We are bound to assume that when the legislature adopted these words, it adopted the meaning and intended the force and consequences already attributed to them by the courts of England, and accepted as our common law.  The committee of distinguished men which prepared the Revision of our statutes in which this provision first appeared, was appointed in 1820. They finished their work and made their report to the legislature in May, 1821.  The proposed revision "underwent a patient and careful investigation," was adopted during the May session of 1821, and approved June 5th, 1821.  Rev. 1821, pp. VII, IX, 486.  During this time neither the revision committee nor the legislature had in mind any information to influence them in the interpretation of the language they adopted and used, or any reason to indicate any other intention

which that language might express, except that which they had acquired from the decisions of the courts to which we have referred. The opinion in *James* v. *Marvin* was not within their knowledge, because it was not announced until after their investigations had been completed and the terms of their Act decided upon and approved. But whatever light these circumstances may throw upon the matter, we think the explicit and exclusive language of the Act of 1821 plainly indicates the intention of the legislature to declare, in words of which the meaning was clearly and firmly fixed, that "a later will or codicil" by which a will or codicil should be revoked, although it contain a clause of revocation, must be in existence and take effect at the death of the testator. It follows that the revocation or destruction of any later will sets up a then-existing former will in the place it held before the later will was made.

We have already held, and it is not questioned, that a later will not containing a revocatory clause, but in its provisions inconsistent with a former will, does not affect a former will until it takes effect at the death of the testator, and that in that respect the legislature did not intend by the Act of 1821 to change the then-prevailing law of this State. *Peck's Appeal*, 50 Conn. 562, 565. The reason stated to support this principle is that an implied revocation by a later will with different devises and bequests is "ambulatory, until the death of the testator; for although, by making a second will, the testator intends to revoke the former, yet he may change his intentions, at any time before his death." *James* v. *Marvin*, 3 Conn. 576, 578. Or, as it is expressed by the author of a recent text-book, the reason is that the inconsistent provisions in the second will clearly manifest the intent of the testator to revoke the former will; "yet this intent, being purely

testamentary in its character, can have no effect until the death of the testator, and, if the instrument containing it is destroyed before that time, this revocatory intent is, for legal purposes, as though it had never been, and the first will, being uncanceled, takes effect." Gardner on Wills (2d Ed.) p. 242. See also 1 Alexander's Commentaries on Wills, p. 756. These are the very reasons upon which the high authorities we have mentioned have rested their conclusion that a will with an express revocatory clause does not take effect until the death of the testator. In some cases an attempt is made to point out a difference between an implied revocation because of inconsistency and an express revocation. The former is conceded to be testamentary, and therefore ambulatory; the latter is assumed to be a separable writing, operating instantaneously and independently of the instrument in which it is expressed. No reason has been given which warrants such a distinction. It has no foundation except the dictum of judges. While they admit that all wills are ambulatory and that their devises, bequests and appointments of executors and trustees cannot take effect until the death of the testator, they single out the revocatory clause and invest it with a character quite different from that of a will. It has been asserted that the insertion of this clause is "a positive act," which operates instantly and by its own strength; but it is not explained how this particular provision becomes an act more "positive" than any other in the will, nor from what source it obtains the peculiar vigor that enables it to operate independently of the will, nor by what signs we know that the testator intended it to take effect immediately upon his execution of his will, nor by what principle of law he has been deprived, or has deprived himself, of the privilege and right to change his mind about revoking

a former will and to resume his intention of letting it stand.

The clause of revocation is neither necessary nor nugatory. Its omission indicates the testator's intention that the later will shall revoke a former will only in such particulars as are inconsistent and so far as the inconsistency extends, and that in all other respects both wills shall be carried into effect. 1 Alexander's Commentaries on Wills, pp. 713–716; Gardner on Wills (2d Ed.) p. 238; 1 Schouler on Wills (5th Ed.) § 407. The insertion of a revocatory clause expresses the testator's intention to leave no place for inconsistency, but to wipe out all previous provisions he may have made and to substitute the provisions of the later will when it shall take effect on his death. Thus he effectually forestalls the conflicts and complications in construing the former and the later wills together, and "furnishes a more prompt and positive mode of repealing than simply to provide differently by the new will and trust to inferences." 1 Schouler on Wills (5th Ed.) § 417. This function manifestly cannot be useful unless a prior will be still in existence when the time arrives to present the later will for probate.

It would be difficult to demonstrate logically that an express revocatory clause was not a legal expression of the testator's intention respecting the disposition of his property after death, made known through a written declaration, to which the law will give effect only after his death and execute as his will; *Jacobs* v. *Button,* 79 Conn. 360, 362, 65 Atl. 150; or that it is not the exercise of the testator's privilege of individual control of his property under the conditions prescribed by law; *Hatheway* v. *Smith,* 79 Conn. 506, 518, 65 Atl. 1058. If this declaration of intention is not a will, by the terms of the statute no will is revoked by it. If it is a will, it must have that essential quality of a will which is

expressed by the word ambulatory. Page on Wills, p. 49. "It is this ambulatory quality which forms the characteristic of wills." 1 Jarman on Wills (6th Ed.) p. * 18. The statute gives the testator a choice of several means of revoking a will, some of which are effective immediately and some only at his death. If he choose to use the ambulatory means, the law will uphold his choice and carry out his intention thus indicated. In *Peck's Appeal,* 50 Conn. 562, 566, we said that the weight of authority seemed to be in harmony with the conclusions expressed in 1 Redfield on Wills (4th Ed.) p. * 328, concerning a will containing a clause of revocation, that "the whole instrument is, therefore, ambulatory, and when destroyed, it all ceases to have any operation." And we added: "We also think that to be the most reasonable view. The testatrix by executing the second will evinced no intention to become intestate, but rather a contrary intention. By destroying the last will and carefully preserving the first, she affords satisfactory evidence that she intended until the very last to die testate, and that that should be her will. In the absence of an express provision to that effect, we cannot presume that the legislature intended that the mere execution of a will should in all cases revoke a prior will. Such a construction would in many cases defeat the manifest intention of the testator. The statute requires a 'later will or codicil.' We think that means an operative will or codicil." In that case the reasoning and authorities referred to were applied to a will not containing a clause of revocation. We are of the opinion that they apply with equal force to a will containing a clause of revocation. This conclusion has been expressed and applied in other jurisdictions since *Peck's Appeal* was before us in 1883. *In re Gould's Will,* 72 Vt. 316, 319, 47 Atl. 1082; *Bates* v. *Hacking,* 29 R. I. 1, 68 Atl. 622; *In re Diament's Es-*

*tate,* 84 N. J. Eq. 135, 92 Atl. 952; *Stetson* v. *Stetson,* 200 Ill. 601, 66 N. E. 262; 40 Cyc. 1215.

This principle of law was so strongly entrenched in England that a statute was needed to dislodge it. In 1837, the Parliament decreed that no will or codicil, or any part thereof, which should be in any manner revoked, should be revived otherwise than by the re-execution thereof, or by a codicil executed as required by the Act, and showing an intention to revive the same. 1 Victoria, Chap. 26, § 22. This statute in substance has been adopted in many of the States of this country, including New York, Indiana, Ohio, Kansas, Missouri and California. The decisions of the courts of these States are controlled by such legislation, and have therefore no direct bearing upon the subject of revivor in Connecticut, where no statute has been enacted. In Massachusetts, Vermont, New Hampshire, Maryland, Michigan, Minnesota and Pennsylvania, the statute permits wills to be revoked by "some other writing" than a will, if it be executed in the manner provided for the execution of wills. This, as we have seen, has not been the law of Connecticut since 1821. In Iowa, the code provides that a will may be revoked "by *the execution* of subsequent wills"; and accordingly it was held in *Blackett* v. *Ziegler,* 153 Iowa, 344, 133 N. W. 90, that "it is *the execution* of the instrument in proper form which effectuates the revocation." Decisions which are compelled or conclusively influenced by such local laws necessarily have little weight in our courts where no similar law is now in force.

In the present case, upon the facts agreed upon, the plaintiff asked the court to rule that the will of 1919 "irrevocably revoked" the will of 1914, and therefore to direct the jury to render a verdict for the appellant. This the court properly declined to do. Upon

these facts the only conclusion which the jury could reasonably have reached was that the will of 1919, with its clause of revocation, did not immediately and finally take effect to revoke the will of 1914; that when she destroyed the will of 1919, the testatrix left the will of 1914, which she was carefully keeping in existence, in force as her will; and that no other will having been found, the will of 1914 was the only written declaration relating to the disposition of her property which subsisted at her death. Therefore, in directing a verdict sustaining this will, the court made no error.

This conclusion makes it unnecessary to consider the defendants' bill of exceptions.

There is no error.

In this opinion BEACH and CURTIS, Js., concurred; GAGER, J., concurred in the result, but died before the opinion was written.

WHEELER, C. J. (dissenting). The majority opinion states the question at issue and then says: "In deciding this question we are governed solely by the statute of wills of this State which was enacted in 1821." It holds that § 6 of Chapter 1 of Title 32, Rev. 1821, p. 200, was copied from § 6 of the English statute of frauds, which is true, and it interprets the language that "no devise of real estate shall be revoked, otherwise than by . . . some other will or codicil in writing," to mean by some other operative will or codicil. And it holds that the present language of our statute (§ 4946): "No will or codicil shall be revoked in any other manner except by . . . a later will or codicil," has not changed the meaning of the statute of 1821, and that "a later will or codicil" means an operative will or codicil. It argues that our legislature adopted the common law of England which had been established

by the interpretation placed by the judges of the Court
of King's Bench of England upon § 6 of the English
statute of frauds.    In the course of the opinion the
majority depart from the announced purpose, and en-
deavor to show that Lord Mansfield's rule, that a revo-
cation must be by an operative will, is the correct
rule, and that the opinion of our court in *James* v.
*Marvin*, 3 Conn. 576, is wrong in principle and wrong
in authority.

I differ with this interpretation of our statute, but
if my brethren had limited the discussion to the mere
construction of the statute, this dissent might have been
confined to a comparatively small compass.  Since, how-
ever, it expressly overrules the principal point decided
in *James* v. *Marvin*, which is one of the notable con-
tributions of constructive legal reasoning in our reports,
in justice to the court of that day I must attempt to
demonstrate that the doctrine of *James* v. *Marvin* is
established by the overwhelming weight of authority
in this country, judicial and legislative as well, and is
fundamentally sound.

I purpose discussing, first, whether the express clause
of revocation in the second will revoked, at its execu-
tion, the first will, or whether the clause of revocation
remained ambulatory and inoperative until the death
of the testatrix.   If in fact the revocation occurred at
the execution of the second will, it is difficult to see how
the first will could be revived save by its re-execution.
If the revocation was, with the will, ambulatory, it
never took effect and the first will never was revoked.
In the discussion of this subject which treats the rev-
ocation as ambulatory, the destruction of the second
will is frequently said to revive the first.  But this is a
misuse of terms.  There is no revival, since there has
been no revocation.  Having considered first the law
irrespective of our statute of wills, I shall then de-

termine the effect of our statute of wills, General Statutes, § 4946. The precise question came before this court in *James* v. *Marvin*, 3 Conn. 576, and the court, speaking by HOSMER, C. J., said: "An express revocation is a positive act of the party, which operates, by its own proper force, without being at all dependent on the consummation of the will in which it is found, and absolutely annuls all precedent devises." The CHIEF JUSTICE quotes from Powell on Devises, p. 551, that "if a prior will be made, and then a subsequent one expressly revoking the former, in such case, although the first will be left entire, and the second will afterwards cancelled, yet the better opinion seems to be, that the former is not thereby set up again." The court further said: "The reason has been already assigned. It is because an express revocation is a positive act of the party, independent of the will which may happen to contain it, and operating instantaneously, and *per se*. As a clear consequence resulting from this principle, all prior wills are recalled or reversed,—the proper meaning of the word, *revoked,*— and must remain in this condition, until revived by republication. . . . A deed of revocation, separate from a will, has the effect of annulling a prior will, instantaneously; and the operation is the same, whether the revoking clause be in deed or will; for it is never a necessary part of the latter. . . . By the express revocation, the will in question was destroyed; and never having been revived by republication, it is of no legal validity." *James* v. *Marvin* has never been overruled. Its doctrine was recognized as the unquestioned law of the State from 1821 for over sixty years, and remained thereafter unimpaired except for the intimation in *Peck's Appeal*, 50 Conn. 562, in 1883, that it had been changed by the statute, now § 4946. Its doctrine that the revocatory clause of a later will acts instantane-

ously, and therefore the revocation of the later will cannot revive the earlier, has become the accepted law of the very great majority of the States, and forms a part of their law either in judicial opinion or by statute. Few opinions of this court have had as large an influence in shaping the law of other jurisdictions. This is all the more remarkable because it has had to contend with the doctrine attributed to Lord Mansfield, that the revocatory clause of the second will was, like the will, ambulatory, and became operative when the testator deceased. Lord Mansfield's rule originated in *Goodright* v. *Glazier*, as reported in 4 Burr. 2512. This report was before CHIEF JUSTICE HOSMER when he wrote the opinion in *James* v. *Marvin*. He points out that the case decided by Lord Mansfield was one of an implied revocation and not that of an express revocation, and upon the face of this report it so appears to have been. The Supreme Court of Maryland reached a like conclusion, and so have other jurists in reading the report of this case. CHIEF JUSTICE HOSMER's distinction between the express and the implied revocation is to-day generally accepted as sound. In Buller's Introduction to the Law, Nisi Prius, p. 266, and in the reporter's note in Lofft's report of cases in Chancery, *Goodright* v. *Glazier* is referred to as a case where the second will contained an express clause of revocation. And this interpretation of this case seems to have been finally generally accepted, and this rule, known as Lord Mansfield's, been adopted as the rule of the common-law courts of England, and so remained until changed by the statute of 1837.

The ecclesiastical courts of England adopted a different rule, and one which finally settled into the rule that the revival of the earlier will would depend upon the intention of the testator, to be gathered from any circumstances in the case. These two rules created

confusion in the English courts, and finally, having had a long experience with them, and having before it the example of a number of American States which had adopted by judicial decision or statute the rule of *James* v. *Marvin*, the English Parliament, in 1837, enacted that no will or codicil, or any part thereof, which should be in any manner revoked, should be revived, otherwise than by the re-execution thereof, or by a codicil executed as required by the Act, and showing an intention to revive the same. 1 Victoria, Chap. 26, § 22. Under this statute "it has been steadily held that after the execution of a subsequent will containing a revoking clause, or provisions inconsistent with those of a prior will, such former will cannot be revived by the simple cancellation or destruction of the latter will." Gardner on Wills (2d Ed.) p. 242. A number of American States, at least thirteen, have passed similar statutes. Of the other States, the great majority of courts which have passed upon the point have adopted the rule of *James* v. *Marvin*, or the ecclesiastical rule or a modification of it. In only a few States has the so-called common-law rule of Lord Mansfield been adopted, viz: Illinois, Rhode Island, New Jersey, Vermont and North Carolina. Viewing the law of the country as a whole upon this subject, as found in judicial decision and statute, I must agree with the Supreme Court of Nebraska in its opinion that Lord Mansfield's rule has been thoroughly disapproved in this country as well as in England. A similar opinion has been frequently expressed. See 1 Schouler on Wills (5th Ed.) § 415; 21 Yale Law Journal, note, p. 672; *Bohanon* v. *Walcot*, 1 How. (Miss.) 336. The doctrine of CHIEF JUSTICE HOSMER, that "an express revocation is a positive act of the party, which operates, by its own proper force, without being at all dependent on the consummation of the will in which it is found,

and absolutely annuls all precedent devises," is the accepted rule except in the few States which follow the rule of Lord Mansfield. The doctrine of *James* v. *Marvin* as to the effect of an express revocation in a later will, has been generally approved in those States which have adopted the rule of revivor of the earlier will by intention. I quote from a few of the opinions which adopt this rule of revocation. "Therefore, where a second will is drawn and executed with the formality required by the statute, and containing an unlimited revocatory clause, all former wills are wiped out and held for naught. The operation of the revocatory clause is immediate and absolute. It is an act done solemnly and deliberately for present effect, and not one contemplating that future circumstances are to determine whether it shall have force. . . . By the great weight of authority in this country the destruction or revocation of the subsequent will containing the revocatory clause does not have the effect of reviving the former will." *In re Noon's Will*, 115 Wis. 299, 301, 91 N. W. 670. The court says in *Cheever* v. *North*, 106 Mich. 390, 392 (64 N. W. 455): "The great weight of authority is to the effect that the execution of a subsequent will, containing an express clause revoking the former will, operates as a revocation at once." In *Blackett* v. *Ziegler*, 153 Iowa, 344, 353, 133 N. W. 901, the court thus expresses itself: "A will once executed may be revoked by the execution of an instrument of revocation or cancellation, and this instrument may be a new will, containing an express clause of revocation, or by an instrument of revocation alone. . . . It is the execution of the instrument in proper form which effectuates the revocation. This view is sustained by reason and the weight of authority, although disapproved by a minority of the courts." *Colvin* v. *Warford*, 20 Md. 357, 391, relying upon *James* v.

*Marvin,* upholds its doctrine of revocation in these terms: "But a clause in a subsequent will, which in terms revokes a previous will, is not only an expression of the purpose to revoke the previous will, but an actual consummation of it, and the revocation is complete and conclusive, without regard to the testamentary provisions of the will containing it." The leading case adopting the ecclesiastical rule of revivor and pushing it to its logical conclusion, is *Pickens* v. *Davis,* 134 Mass. 252, 256, and this is what the court said of the clause of revocation in the second will: "The clause of revocation is not necessarily testamentary in its character. It might as well be executed as a separate instrument. The fact that it is inserted in a will does not necessarily show that the testator intended that it should be dependent on the continuance in force of all the other provisions by which his property is disposed of. It is more reasonable and natural to assume that such revocatory clause shows emphatically and conclusively that he has abandoned his former intentions, and substituted therefor a new disposition of his property, which for the present, and unless again modified, shall stand as representing his wishes upon the subject." The following authorities sustain this doctrine. *Barksdale* v. *Hopkins,* 23 Ga. 332; *Wallis* v. *Wallis,* 114 Mass. 510; *Lane* v. *Hill,* 68 N. H. 275, 277, 44 Atl. 393; *McClure* v. *McClure,* 86 Tenn. 173, 179, 6 S. W. 44; *Kern* v. *Kern,* 154 Ind. 29, 37, 55 N. E. 1004; *In re Cunningham,* 38 Minn. 169, 172, 36 N. W. 269; *Melhase* v. *Melhase,* 87 Or. 590, 601, 171 Pac. 216; *Hairston* v. *Hairston,* 30 Miss. 276, 305; *Lively* v. *Harwell,* 29 Ga. 509, 514; *Matter of Thompson,* 11 Paige Ch. (N. Y.) 453; *Williams* v. *Miles,* 68 Neb. 463, 94 N. W. 705, 96 id. 151. The authority in this country holds overwhelmingly with CHIEF JUSTICE HOSMER the first question decided in *James* v. *Marvin,* that a clause in a will ex-

pressly revoking former wills takes effect immediately, and that there is no difference between the express revocation in the will and that in any other writing. The will is ambulatory, but the revocation is not dependent on the operation of the will but is the positive act of revocation of the party and operates instantaneously when made. The majority opinion holds that the distinction made by CHIEF JUSTICE HOSMER, that the implied revocation cannot take effect until the death of the testator because the will is ambulatory while the express revocation in a will takes effect instantaneously, has "no foundation except the dictum of judges." This distinction has been made by our own court in *James* v. *Marvin* and by the very great weight of judicial opinion in this country. The express clause of revocation of former wills is a positive statement showing conclusively the intention of the testator to abandon his former will and substitute for it a new one. It is thus a positive, substantial act expressive of such intent. This is the natural and the ordinary interpretation of such a clause in a will. The destruction of the second will and the preservation of the first will is said, in *Peck's Appeal* and approved in the majority opinion, to be satisfactory evidence of the testator's intention to revive the first will. This view is contrary to almost all opinion, including that which has adopted the intention rule. The majority opinion also quotes with approval *Peck's Appeal*, that the weight of authority seemed to be in accordance with the quotation from Redfield to the effect that the revocatory clause was ambulatory. My examination of the authorities leads me to exactly the opposite conclusion. Space forbids further discussion of the majority opinion upon this point. I leave this subject with this suggestion. If the express clause of revocation in a will does not become effective until the will becomes

operative, it is a nugatory clause in the will, since the last will of a testator possessing testamentary capacity, when duly executed and without undue influence, revokes all former wills upon his death. And yet as Schouler says: "No well-drawn testament omits at the present day a clause of revocation." 1 Schouler on Wills (5th Ed.) § 417.

The next question is whether the statute of 1821, now General Statutes, § 4946, changed the rule of *James* v. *Marvin* in its doctrine that an express clause of revocation of former wills in a later will revokes an earlier will, and that the revival of the earlier will cannot be had save by republication. The study of our statute satisfies me that its framers did not intend to change either of the points decided in *James* v. *Marvin,* and did not in fact do so. The purpose of the statute was quite different. Mr. Sherman, in his brief in *Witter* v. *Mott,* 2 Conn. 67, correctly and illuminatingly states the situation of the law in England and in Connecticut. He says: "In England, previous to the statute of frauds, devises of land by custom, or pursuant to the statute of wills (32 Hen. 8, C. 1, and . . . 35 Hen. 8, C. 5) were revocable by words only, without writing. . . . Our statute of wills, so far as it extends, is a transcript of the English statute of frauds; but our legislature have *omitted* the 6th section of the latter statute, which requires a revocation by an express declaration to be in writing, signed by the devisor, in the presence of three witnesses. If this subject had simply been left free from legislative restriction, it would have been sufficient for the present purpose; but the rejection of the 6th section by our legislature, after adopting the 5th, shows a positive intention which cannot be disregarded." And because we had failed to include in our statute of wills § 6 of the English statute of frauds, which was a transcript of that stat-

ute as it related to wills except for its omission of § 6, wills in Connecticut could be revoked orally (*Card* v. *Grinman,* 5 Conn. 164) or in writing (*Witter* v. *Mott,* 2 Conn. 67), when *James* v. *Marvin* was decided in June, 1821; and such continued to be the law until §.6, Chapter 1, Title 32 of the Revision of 1821 became the law, January 1st, 1822. Section 6 of the English statute of frauds was in part as follows: "VI. And moreover, no devise in writing of lands, tenements or hereditaments, nor any clause thereof, shall at any time after the said four and twentieth day of June be revocable, otherwise than by some other will or codicil in writing, or other writing declaring the same, or by burning, cancelling, tearing or obliterating the same by the testator himself, or in his presence and by his directions and consent." Pickering's Stats., Vol. 8, p. 406. In England the revocation of a will devising land, except in the four specified ways, must under this statute be in writing; as to personalty the statute did not apply. It never occurred to the English legislators until 1770, nor to their jurists, that the will whose revocation was provided for in this statute was intended to be an operative will and hence upon the destruction of a second will containing a clause of revocation the earlier will revived. This needs no further proof than that contained in the fact of the creation of Lord Mansfield's rule at this time, and to the development of the ecclesiastical rule and the subsequent enactment of the statute of revivor, 1 Victoria, Chap. 26; all, while § 6 of the statute of frauds continued. an active and much referred to statute. The English statute of frauds contained no provision to meet a situation where the will containing a revocatory clause was itself revoked while an earlier will remained in existence. This was left to the rules established by the courts until both common law and ecclesiastical rule were swept aside in the

enactment of the revivor statute, 1 Victoria, Chap. 26. Mr. Roberts, in his article in 39 Amer. Law Reg. 506, remarks: "The statute is silent as to the result of such revocation upon former wills. Its framers were careful to provide how a will might be revoked, but failed to provide any method for the revocation of a revocation. This was probably due to the fact that it was considered that a revocation of a revocation was itself really a new testamentary act." In 1821, Title 32, Chapter 1, § 6, we enacted § 6 of the English statute of frauds whose omission had been noted by Mr. Sherman. It read as follows: "No devise of real estate shall be revoked, otherwise than by burning, cancelling, tearing, or obliterating the same, by the testator himself, or in his presence, by his direction and consent; or by some other will or codicil in writing, declaring the same, signed by the testator, in the presence of three or more witnesses, and by them attested in his presence." "The statute of 1821 applied to every will containing devises of real estate and every will containing both devises of real estate and bequests of personal property." *Goodsell's Appeal*, 55 Conn. 171, 179, 10 Atl. 557. In this respect it was identical with the English statute, § 6, and is copied from it, and its purpose was identical with that of its prototype, § 6. The only difference between the English statute and ours, was that our statute provided for a revocation by will or codicil, and the English statute provided, in addition, for a revocation by "other writing," and our statute provided that the witnesses should attest in the presence of the testator, while the English statute made no such provision. These differences did not affect the essential purpose of the two statutes. Our statute, like the English statute, governed the revocation of wills containing devises of lands, while the revocation of the disposition of personalty continued to be controlled

by our common law as announced in *James* v. *Marvin.* Our statute, like the English statute, did not attempt to meet the situation when the second will containing a revoking clause was destroyed leaving an earlier will in existence. Its purpose was not to serve as a statute of revivor and it never has been so understood. The statute of 1821 required a revocation by "will or codicil in writing, declaring the same," and this meant that the will itself should contain the express revocatory clause. *Stetson* v. *Stetson,* 200 Ill. 601, 66 N. E. 262. In America this section of the English statute of frauds has been enacted in most of the States and in substantially this form. So far as I can discover it has never been construed away from its purpose as a statute of frauds into a statute of revivor. My brethren say that *Goodright* v. *Glazier,* and the other decisions which made the rule of Lord Mansfield the common law of England, interpreted and declared the meaning of the words used in § 6 of the English statute of frauds, and that this was adopted as the common law of this State. My brethren are surely in error in this. My brethren also hold that in enacting § 6 as a part of our law in 1821, our legislature adopted the meaning attributed to them by the courts of England and accepted as our common law. But the opinion had already held that *James* v. *Marvin* stated our common law and that this was changed by statute; if this is sound, the statute could not have been adopted as expressing our common law. Moreover, our Supreme Court had never, prior to *James* v. *Marvin,* determined the principal point involved in that case. Our Superior Court had ruled in accordance with the subsequent opinion in *James* v. *Marvin.* That was the situation of our common law upon this point. We had never adopted the English rule of Lord Mansfield. And when we came to pass upon the rule we repudiated it.

*James* v. *Marvin* was argued after the legislature had enacted in May the Revision of 1821, containing the section under consideration. The opinion was handed down late in September following. The Revision went into effect January 1st, 1822. My brethren argue that the revisors and legislature had before them in the interpretation of this section nothing except the decisions under the common law of England. The chairman of the Revision Committee was the preceding CHIEF JUSTICE, ZEPHANIAH SWIFT, and another member was Thomas Day, the Reporter of the Supreme Court. It is scarcely believable that a change in the law of so momentous a character as the majority attribute to this section, would have been made by these revisors, or if it was the legislative intent, that they would not have known of it, or that *James* v. *Marvin* would have been argued by Roger Minot Sherman, and the opinion of the court written by CHIEF JUSTICE HOSMER with no reference to the statutory adoption of Lord Mansfield's rule by the former CHIEF JUSTICE and the court's Reporter. The inference is not that which my brethren draw, but rather that their failure to refer to this statutory adoption of Lord Mansfield's rule is the clearest proof that the statute of 1821 intended no such thing. If the legislature intended, in enacting the statute of 1821, to make devises of realty which contained an express clause of revocation, merely revocable when the will became operative, and the testamentary disposition of personalty was to be governed by the subsequent rule of *James* v. *Marvin,* and hence continued revocable upon the inclusion in will or codicil of an express clause of revocation, this would have made hodge-podge of our law, embarrassed the settlement of estates, and have run counter to the universal professional opinion which existed certainly as late as *Peck's Appeal,* 50 Conn. 562–565. "Will" is used in the chap-

ter on wills, in the Revision of 1821, usually as the instrument executed as a will, but occasionally as the operative will when probated.   In § 6 it is used as the instrument executed as a will, just as it is in § 6 of the English statute of frauds.   "Will" as used in this section, is an instrument which is "the legal declaration" of a person's mind or intention respecting the manner in which he would have his property or estate disposed of after his death.   2 Bl. Com. 499.   And when the intention or will is expressed in writing in the form required by statute, it is a completed will.   The majority opinion holds that the statute of 1821 changed the law of the State.   This seems in conflict with the position to which I have referred, that our common law was the English common law as it had interpreted § 6 of the English statute of frauds.   The argument that the revoking clause is as much a part of the will as any other clause, and one clause cannot take effect without the other clauses, does not, as I think, touch the position of Chief Justice Hosmer that the insertion of a revocatory clause in a will duly executed is a substantive, positive act, declarative of the purpose of revocation.   It is said our statute indicates plainly that it did not provide for an instantaneous revocation. Why not?   Four methods of instantaneous revocation are provided, why should the fifth method be assumed to take effect on the decease of the testator?   By providing for a revocation by will or codicil and excluding revocation by other writing or by oral word, the majority say the inference is clear that the legislature did not intend to continue to grant the privilege of instantaneous revocation.   That is to say, three methods of instantaneous revocation were recognized by law before the statute, by will, by other writing, or by oral revocation.   The legislature enacted that revocation might be had by one of these methods, viz: by will, therefore

the majority hold its exclusion of the other methods indicated that it meant thereafter to confine the revocation by will to an operative will, and to deny the privilege of instantaneous revocation by will. The logic of this reasoning does not seem satisfying. I think it entirely conclusive that the statute of 1821 did not refer to the revocation of operative devises, but to the revocation of devises by will which expressly declared that former wills were revoked; neither did the statute contemplate the revivor of the earlier will upon the destruction of the later one. Its purpose was to thereafter prevent the revocation of wills orally, or in writing, save in the manner prescribed by the statute, and to make our law conform to § 6 of the English statute of frauds and to be in harmony with the law of our States which had enacted similar statutes.

The origin and history of this statute confirm this interpretation. The statute of 1821 remained in its original form until the Revision of 1849, p. 347, § 7, when the last clause, which read "or by some other will or codicil in writing, declaring the same, signed by the testator, in the presence of three or more witnesses, and by them attested in his presence," was made to read "or by some other will or codicil, duly executed according to this Act." The purpose of the revisors was to express the same meaning in shorter form. The will or codicil, by § 2 of this Act, was required to be in writing and executed with certain formalities. When the revisors provided that it should be duly executed according to this Act, it was the same as if they had recited at length the formalities required by § 2. When they omitted "declaring the same," they eliminated an unnecessary amplification of the statute. These words meant that the revocation should be expressed in the will. There was no occasion for inserting these words. The statement that the will should declare the

revocation was unnecessary, for to effect the revocation under our law of *James* v. *Marvin,* the express revocatory clause was essential. A will which did not declare the revocation did not come within the statute as a will which revoked a former will, and hence a will without such clause could not under the statute of 1821, and under General Statutes, § 4946, revoke a former will. The will could be revoked by an express or an implied revocation. Manifestly the statute does not refer to an implied revocation. The omission of this phrase was for the sake of brevity. This section is in the same form in the Revision of 1866 as in the Revision of 1849. So our law remained until the Revision of 1875. The Revision of 1875, Chapter XI, p. 370, § 7, changed the last clause of § 8, p. 403, of the Revision of 1866, which read as did § 7, p. 347, of the Revision of 1849, "or by some other will or codicil, duly executed according to this Act," to "or by a later will or codicil." Prior to this Revision our law provided that wills devising real estate could be revoked by a will or codicil duly executed according to the Act (Tit. 20, Chap. 1, Rev. 1866). Since by this Act all wills and codicils must be in writing and executed according to a certain form, this provision was the same as if § 2, p. 402, Revision of 1866, had been incorporated in this section. It could not be a completed will by the Act unless it was executed according to the Act. So that the change in the phraseology obviously did not change the meaning; it did what the Revision of 1875 frequently did, it made expressions briefer and more precise. At this time dispositions of personal property could be revoked by an express revocation in will or codicil, or other writing, and were not controlled by statute. *James* v. *Marvin,* 3 Conn. 576. The substantial change in the law made by the Revision of 1875 was in substituting in place of "no devise of real estate," "no will or codi-

cil," thus making the provisions of our revoking stat-
ute applicable not only to devises of real estate, but to
all wills and codicils. It in this way provided that the
revocation of the will of personal property as well as
the devise of real estate, might be by "a later will or
codicil." It brought all dispositions of property by
will within the section of the statute of wills, which
had theretofore been confined to devises of real estate.
The terms of this section in the Revision of 1875 have
remained unchanged except that a comma was omitted
in the Revision of 1888, before "or by later will or codi-
cil." With the exception of this inconsequential
change, the statute is as enacted in the Revision of
1875. *Peck's Appeal,* 50 Conn. 562–566, agrees with
this conclusion that the meaning of "later will or codi-
cil" is identical with the meaning of the last clause of
§ 6, p. 200, of the Act of 1821, and the majority opinion
takes this view. The statute of 1821 has not been
changed so far as its provisions of revocation are con-
cerned, but these have been made to apply to disposi-
tions by will of personalty, as well as dispositions by
will of realty. The General Assembly never could have
intended, in the Revision of 1875, to overturn the doc-
trine of *James* v. *Marvin* which had been regarded as
the law of the State since 1821, and to restore the com-
mon-law rule of Lord Mansfield, especially since at this
time it had been thoroughly discredited in its own home,
disapproved throughout most of the States, and espe-
cially when *James* v. *Marvin* had been the base upon
which the law of England and of the United States
had been builded. If the legislature had intended to
change the law as announced in this case, would it
not have changed the language of this section to conform
to its intent in some one of these revisions of the stat-
utes?

The record presents a further question. The ap-

pellees offered evidence to prove the intention of the testatrix to revive the first will by showing the declarations of the testatrix that it was her intention and belief that in destroying the second will she did so with the intention that her first will was to be her last will. The court excluded this evidence, and the appellees in their bill of exceptions present this question for decision. If the bill of exceptions had not raised this point there would have been no occasion for reexamining the second point decided in *James* v. *Marvin*, that upon the destruction of the first will by the revocatory clause in the second, the first will could not be revived save by republication. For in the agreed statement of facts the only fact from which the intention of the testatrix might be claimed, is that the second will containing a clause revoking all former wills was destroyed and the first will found among the valuable papers of the testatrix. The authorities generally concur in holding that the intention to revive the first will cannot be found from the mere fact of the destruction of the second will. This fact alone would furnish too slight a basis upon which to find the testator's intention. *Blackett* v. *Ziegler*, 153 Iowa, 344, 133 N. W. 901; *Williams* v. *Miles*, 68 Neb. 463, 94 N. W. 705, 96 id. 151; *McClure* v. *McClure*, 86 Tenn. 173, 179, 6 S. W. 44; *Lane* v. *Hill*, 68 N. H. 275, 44 Atl. 393; *In re Gould's Will*, 72 Vt. 316, 319, 47 Atl. 1082; 1 Schouler on Wills (5th Ed.) § 415. The leading case in this country upholding the admissibility of such evidence is *Pickens* v. *Davis*, 134 Mass. 252. I state briefly my chief reasons for thinking this ruling wrong. If parol evidence be admitted for this purpose, there is no stopping place. The conclusion of the Massachusetts courts is the only logical one to make. Whatever the rule of revivor might be in jurisdictions "where no statutory method of revocation is prescribed and where no for-

mality is necessary to the making of a will," the rule of *Pickens* v. *Davis* cannot be justified in jurisdictions where there is a statutory method of revocation and one for the execution of wills. If the first will has been revoked there is nothing to revive. And if the statute prescribes formalities for the execution of a will, these should be strictly observed and no revivor of a will once revoked be permitted unless the will shall be re-published with all the statutory sanction. To permit the oral declarations of the testatrix in proof of her intention to make the first will her last will, is in effect to republish the first will. If the will can only be made in a prescribed way it should not be republished, that is, re-executed, unless in the same way. To hold otherwise is to violate a provision of the statute of wills which has been deemed, and is, of supreme importance.

In my opinion there was error in directing a verdict for the appellees.